681 So.2d 1230 (1996)
STATE of Louisiana
v.
Larry ROY.
No. 95-KA-0638.
Supreme Court of Louisiana.
October 4, 1996.
Rehearing Denied November 15, 1996.
*1232 Nicholas Joseph Trenticosta, New Orleans and W.T. Armitage, Alexandria, for Applicant.
Richard P. Ieyoub, Attorney General, Charles F. Wagner, District Attorney, Clifford R. Strider, III, Alexandria, and Thomas R. Willson, Shreveport, for Respondent.
JOHNSON, Justice.[*]
On July 19, 1994, after three days of voir dire and a five-day trial, a Rapides Parish jury found defendant guilty of two counts of first degree murder in violation of La.R.S. 14:30. Two days later, the jury unanimously recommended that a sentence of death be imposed on defendant. The trial judge sentenced defendant to death in accordance with the jury's recommendation.
On direct appeal to this court, defendant relies on thirty seven assignments of error for reversal of his conviction and sentence, five of which have been briefed.[1] Finding no error, we affirm defendant's conviction and sentence.

FACTS
Sally and Freddie Richard, Jr. were married and had two sons, David and Frederick. The Richards divorced and Mrs. Richard began a relationship with the defendant, Larry Roy. Larry Roy and Mrs. Richard cohabited for some time in Mrs. Richard's home in Cheneyville, Louisiana, with her two sons and Mrs. Richard's 75 year old aunt, Rosetta Silas before she terminated the relationship with Larry Roy in early 1993.
On Sunday, May 2, 1993, the Richards spent the day with their children. During the afternoon, while at a local convenience store, by chance, they encountered Larry Roy, who told Mrs. Richard cryptically: "Things are going to be on tonight." Later that evening, the Richards retired to one bedroom in Mrs. Richard's home. As was generally the case, their two sons slept in sleeping bags next to the bed.
On Monday, May 3, at approximately 1:30 a.m., Roy entered Mrs. Richard's home and barged into the bedroom occupied by the Richards. Roy attacked Mr. Richard and a struggle ensued. During this time, Mrs. Richard attempted to use the telephone to *1233 obtain help. However, as she picked up the receiver, Roy informed her that the telephone was dead. Roy brandished a knife which he used to stab Freddie Richard to death. Mrs. Richard attempted to flee the bedroom with her children, but she was stopped by Roy. Still armed with a knife, Roy forced the children to lay down on the floor in the hall outside of the bedroom. Then, he made Mrs. Richard accompany him to the bedroom occupied by Ms. Silas where he demanded money. She gave him $50.00 which she kept under her mattress. Roy counted the money and questioned Ms. Silas regarding whether she had more money; Ms. Silas responded negatively. Next, Roy carried Mrs. Richard into the kitchen where he asked her why she had told someone that he had slit her car tires. He then brought her into the living room and placed her lying face down on the floor beside a sofa. Using a telephone cord that he brought with him, Roy tied Mrs. Richard's hands behind her back. Then, he pulled Mrs. Richard's head back and slit her throat, telling her that "[a]bout time the police get here all ya'll going to be dead." Roy also tied Frederick's hands behind his back and slit his throat. He placed a pillow case over David's head, tied David's hands behind his back, pulled David's head back, and slit his throat. After methodically incapacitating Mrs. Richard and her two sons, Roy headed for the bedroom occupied by Ms. Silas. During this time, Mrs. Richard and her sons managed to get out of the house. As they were exiting, they heard Rosetta Silas screaming. Ms. Silas was later found in her bedroom stabbed to death. After killing Ms. Silas, Larry Roy fled the scene. Mrs. Richard, Frederick, and David, survived the incident and testified against Roy at trial[2].
Larry Roy was arrested two days later in Bunkie, Louisiana. He was charged with two counts of first degree murder.
At trial, the defendant attempted to establish an intoxication defense. The defendant testified that on Sunday, May 2, 1993, starting at approximately 5:00 p.m., he consumed several beers and a half pint of gin. Defendant further testified that sometime that evening he purchased $140.00 of crack cocaine which he smoked prior to the next morning. Defendant claimed that because of his intoxicated and drugged state he could not remember his whereabouts or activities from sometime Monday morning until his arrest. Nonetheless, he denied being in Mrs. Richard's home and he further denied killing Freddie Richard and Rosetta Silas or harming Mrs. Richard and her two minor sons.
The jury found the defendant guilty as charged on both counts. The jury also found the presence of five aggravating circumstances on count one[3] and three aggravating circumstances on count two[4] and imposed the death penalty. The instant appeal followed.

ARGUMENT 1
Defendant asserts in his first argument (assignments of error nos. 7, 10, 11) that the *1234 trial court erroneously failed to excuse two prospective jurors based on his challenges for cause.

Venireperson Hempstead
First, the defense argues that venireperson Judith Hempstead's voir dire responses showed that she would automatically vote to impose the death penalty if defendant were convicted and, therefore, the district judge erred when he refused to allow the defense to strike her for cause.
The appropriate standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (citing Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)); State v. Sullivan, 596 So.2d 177, 186 (La.1992). Under Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), as clarified by Witt, if the venireperson "will not consider a life sentence and ... will automatically vote for the death penalty under the factual circumstances of the case before him," the prospective jurors views substantially impair the performance of his other duties. See State v. Robertson, 92-2660 (La. 1/14/94); 630 So.2d 1278, 1284. See also La.C.Cr.P. art. 797(2) and (4).[5]
However, under Witt and its progeny, reviewing courts owe a trial court's determinations about a venireperson's fitness for service great deference, and must affirm them if a trial court's findings are "fairly supported by the record." Witt, 469 U.S. at 424, 105 S.Ct. at 852; State v. Lindsey, 543 So.2d 886, 895 (La.1989). A trial judge is vested with broad discretion in ruling on challenges for cause, and his ruling will be reversed only when a review of the entire voir dire reveals the judge abused his discretion. State v. Knighton, 436 So.2d 1141, 1148 (La.1983). A refusal by a trial judge to excuse a prospective juror on the ground he is not impartial is not an abuse of discretion where, after further inquiry or instruction (frequently called "rehabilitation"), the potential juror has demonstrated a willingness and ability to decide the case impartially according to the law and the evidence. State v. Cross, 93-1189, p. 8 (La. 6/30/95), 658 So.2d 683, 687.
A trial judge's discretion is based on the fact that:
the trial judge has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questioning by the parties' attorneys. Such expressions and intonations are not readily apparent at the appellate level where review is based on a cold record ... As such, we are reluctant to reverse a ruling of the trial judge on a challenge for cause where it does not appear from a review of the record as a whole that the trial judge somehow abused his discretion.
State v. Lee, 93-2810, p. 9 (La. 5/23/94); 637 So.2d 102, 108.
During initial voir dire examination, Ms. Hempstead stated that she had no religious or moral opposition to the death penalty and, if appropriate, she could impose the death penalty. Thereafter, the following exchange took place between Ms. Hempstead and the defendant's attorney:
Q What ... can you explain to me what you mean by appropriate? What circumstances would have to exist for it to be appropriate for you?
A I think that if we prove him guilty of murder of two people and three attempts to murder three other people I'm going to vote for the death penalty.
Q OK. Then that leads me to the question would you automatically vote for the death penalty without regard to the mitigating circumstances that (Interrupted)
A Right.

*1235 Q You would?
A I would.
Q OK. Is there anything that would change that opinion?
A I don't think so.
Later, the district attorney examined Ms. Hempstead. The transcript of the district attorney's rehabilitation questioning reads in pertinent part as follows:
Q I listened to your answers yesterday and I listened to your answers this morning and I listened to your answers just now, I'm a little confused. Do you understand statutory (sic) scheme we have, aggravating circumstances, mitigating circumstances. I'm talking about the penalty itself?
A Yes.
Q Do you understand the Judge is going to tell you that you have to consider the aggravating circumstances and if you find ... at least one of those, and maybe more aggravating circumstances then you are to perform a balancing test to determine whether the death penalty is appropriate. You understand that?
A OK. I understand that.
Q You understand that. Now, at this point he is considered not guilty.
A Right.
Q Right. He's innocent ... excuse me, he's considered not ... not not-guilty, he's considered innocent, because you don't know any facts.
A That's right.
Q The question is, are you going to give him the benefit of that presumption of innocence?
A Am I going to give him the benefit of the doubt? Yes, I am.
Q Benefit of the presumption of innocence.
A Right now, right.
Q No matter what's happened in the past?
A Right.
Q As he sits here right now if you had to vote your vote would be not guilty?
A Right.
Q Do you know of any mitigating ... let's assume for a second that he's found guilty of second degree murder [sic], now we have to go to the penalty phase. Do you know of any mitigating circumstances?
A I don't know anything right now.
Q Do you know any aggravating circumstances?
A I know nothing right now.
Q Can you make a decision on what the appropriate penalty is?
A (NO RESPONSE RECORDED)
Q At this point.
A At this point, no.
Q No, of course not. Will you follow the Judge's instructions?
A Yes.
Q Which say that you have to consider whether there's aggravating circumstances or not and if they're present will you apply the mitigating circumstances? Will you do that?
A Yes, I will.
Q I think a second ago a question was asked you ... a scenario was given.
A Right.
Q And they asked for a commitment from you as to what your vote would be?
A Right, and I tried to give them that.
Q Right. I understand. But did you consider the fact that there may be mitigating circumstances?
A I tried to and ... and like you said, if he's found guilty of two murders and three attempted murders my first opinion is going to be the death penalty.
Q OK.
A Do you understand what I'm saying.
Q Sure.
A But we haven't heard any facts, we know nothing about the case right now.
Q Right, and you haven't heard about any mitigating circumstances.
A Right.

*1236 Q So, is your answer that you could consider the death penalty in a case like that but you would apply the mitigating circumstances, the aggravating circumstances and balance it out?
A I would try to, yes.
Q You would do that?
A Yes.
Q As much as you could?
A As much as I could.
Q And you feel like you could follow the Judge's instructions?
A Yes.
Q All right. Thank you very much.
Defense counsel then unsuccessfully moved to challenge Ms. Hempstead for cause. At the time, defense counsel had only used one of his twelve peremptory challenges. Nonetheless, defense counsel accepted juror Hempstead following his failed cause challenge. Eventually, defendant's peremptory challenges were exhausted.
Based on a reading of the entire voir dire of Ms. Hempstead, we find that the trial judge did not abuse his discretion in failing to grant the defendant's challenge. While Ms. Hempstead's responses reveal that "her first opinion" would be to vote for the death penalty where two people are murdered and there is an attempt to murder three other people, upon further questioning by the district attorney, Ms. Hempstead said she would follow the trial judge's instructions in determining whether the death penalty was appropriate, including balancing the aggravating and mitigating circumstances under the factual circumstances of the present case. Ms. Hempstead not only agreed to follow the judge's instructions, but she also responded that she believed that she could follow the judge's instructions. A review of the voir dire of Ms. Hempstead reveals a willingness on the part of Ms. Hempstead to decide the imposition of a penalty in accordance with the law and the evidence. Ms. Hempstead's responses indicate that her views on the death penalty would not substantially impair the performance of her duties as a juror. Additionally, we find this conclusion supported by defense counsel's failure to use one of the eleven peremptory challenges still available. This tactical decision gives the appearance that defense counsel believed that Ms. Hempstead had been rehabilitated. Based on the foregoing, we find that this juror was successfully rehabilitated, and the challenge for cause was properly denied.

Venireperson LeBlanc
In the second assigned error regarding voir dire, the defense argues that venireperson Timothy LeBlanc refused to consider intoxication as a mitigating factor. Consequently, the defense was forced to use a peremptory challenge to excuse LeBlanc.
Again, a reviewing court owes a district judge's decisions on challenges great deference and must not overturn them unless the record as a whole, including rehabilitation, shows an abuse of discretion. Cross, 93-1189 at 7, 658 So.2d at 686; Robertson, 92-2660 at 4, 630 So.2d at 1281; State v. Ross, 623 So.2d 643, 644 (La.1993).
Defense counsel's initial questioning went as follows:
Q Do you understand the question?
A Yes, sir.
Q And you raised your hand?
A Yes, sir.
Q Give me your answer.
A On ...
Q Could you consider intoxication, if instructed by the Judge, as a mitigating circumstance in ... this case?
A No, sir.
Q You could not follow that instruction by the Court?
A No, sir.
Subsequent rehabilitation by the district attorney was as follows:
Q Mr. Leblanc, when Mr. Armitage [,defense counsel,] asked you about the mitigating circumstance which was, at the time of the offense the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication. You raised your hand and said that you would have *1237 trouble with that mitigating circumstance as it relates to intoxication?
A Yes. The intoxication.
Q Do you understand that all the law says is you've got to consider it, that if the defense proves that the defendant was intoxicated at the time of the offense... if they prove that?
A Yes, sir.
Q And the intoxication was to a degree, not just intoxicated, but intoxicated to a degree that it should excuse his conduct or that it should be a mitigating factor doesn't mean that because you have one mitigating factor that you vote one way or the other, it's a weighing process. Do you understand that you may not think it is a great enough mitigating circumstance to change your mind, or it may not be the one that changes your mind about death penalty or life imprisonment, it's just one of them that you are to consider?
A Yes, sir.
Q It's not the one that makes the determination one way or another, it's just a determination, you understand that?
A Yes, sir.
Q You understand that the theory here is that ... is that if a person is intoxicated to a degree that he acts in a way that ... or she acts in a way that they would not normally act that is a mitigating circumstance?
A Right.
Q You understand that?
A Yeah, I understand now.
Q And, of course, if you were ... if someone you knew were sitting in the same circum ... the same situation that is the kind of mitigating circumstance we want to have.
A Right.
Q You understand?
A Yes.
Q And what is the possibility of ... you know there's two types of intoxication, voluntary and involuntary. If it was an involuntary intoxication that the person had absolutely no control over, you know, someone slipped a drug into his meal or something, you understand?
A Yeah. Um-huh.
Q That would be a mitigating circumstance, don't you agree?
A Yes, sir. That's something he couldn't help.
Q Right. All right, that's one kind, the other kind, of course is voluntary. Somebody is intoxicated to a degree that it should be considered as a mitigating circumstance. Not a controlling circumstance necessarily, but one of the things that you are to consider. Do you understand how the law is set up?
A Yeah.
Q Do you feel like you cannot consider the intoxication at all?
A As a ...
Q A mitigating ... just a mitigating circumstance, that's all.
A Mitigating ... no, sir.
Q Something that you should consider (Interrupted)
A Probably not.
Q Not at all?
A No, sir.
Q You understand (Interrupted)
A Well, what if I ... OK, what if I ... if it ... if he has ... if the person has a problem with it, then yes, I could probably consider that, but if he doesn't have a drinking problem, or a drug problem, then no, sir, I couldn't consider it.
Q Well, if he had a drug problem ... if the person committed a crime that they wouldn't normally commit because of an intoxicated condition either drug or alcohol, I'd say that's a problem.
A Yes, sir.
Q Are you saying that if the person has a continuing problem with it?
A Yeah, continuing problem.
Q Do you understand that it's not required that you excuse the conduct, that it's just required that you consider it as a (Interrupted)

*1238 A Yes, sir. I understand that.
Q You don't have to say it is a mitigating circumstance, you just have to say that... you just have to ... uh ... feel that it's something that you could consider, you're not ... you don't have to say it is. You have to say ... you're not required to say right now that if a person is intoxicated a little bit or whole lot, I would ... that would determine my opinion. What we're asking you to do (Interrupted)
A It wouldn't determine my opinion.
Q It would not?
A No.
Q You would consider it and make the... and give it its appropriate weight at the time you had to make the decision on mitigating and aggravating?
A Yes, sir.
Q Could you do that?
A Depending on the case. Yes, sir.
Q You understand you just shifted. I'm afraid that ... that we're a little confused here. I'm afraid that it's got confusing, and I apologize for that. And I'm not trying to trick you, I'm trying to make sure that ... I'm just afraid I'm not doing a very good job of explaining what are mitigating circumstances. Everyone of these ... uh ... the youth of the offender, that's one of them, that's number ... whatever it is. That is something for you ... that you must consider, if a person is 17, 18, 19, 20, that's something that the law says that you are to consider. You do not have to say, I think because of the youth of the offender that the conduct was excusable to the point that I don't think the death penalty is appropriate. You can say that, but you're not required to. All the law says is that you have to make that one of your considerations. It doesn't determine that it has to be the consideration. Am I making sense?
A Yes.
Q Do you understand how that works?
A Yes.
Q Just like an aggravating circumstance. The aggravating circumstance is that the first degree murder was during the commission of an armed robbery. That is an aggravating circumstance that you ... if you find you must consider. That doesn't mean that because it's during the first degree murder you automatically vote for the death penalty. You weigh them out.
A Yeah, I know that.
Q If it is a 19 year old during the commission of a armed robbery you weigh it out, and it's the same thing with the intoxication and mental disease defense, or mitigating circumstance. You consider it and you give it its due weight, whatever you determine that it's going to be, whatever your personal feelings are, based on the evidence, whatever, as long as you follow the law and you consider it. Then it ... that's what it's designed to do. You consider it, you assign to it whatever you think is right.
A Yes.
Q Do you think you could do that with intoxication?
A Yes, sir.
Q OK. Do you understand you've shifted now, you shifted what you said before.
A Well, I don't ...
Q You're not so sure you did shift, you didn't understand the question?
A Right.
Q OK. That's what I was afraid of. You understand that intoxication is something that you are to consider?
A Yes, sir, I understand that.
Q And do what you want with it.
A OK.
Q Just like any other mitigating circumstance, or any other aggravating circumstance.
A Yes.
Q And you would consider it and give it its due weight based on the facts of this case?
A Yes, sir.

*1239 Q And if it's a first degree murder verdict, and you're required as a juror to come back and determine the appropriate penalty, it would be based on the fact of this case and the offender in this case.
A Yes, sir.
Q You understand that?
A Yes, sir.
Q Not based on anything else?
A Right
Q And you could consider that intoxication (Interrupted)
A As a mitigating (Interrupted)
Q ... as a mitigating circumstance?
A Yes, sir.
Q OK. Fine.
Initially, venireperson LeBlanc said that he could not follow an instruction directing him to consider intoxication as a mitigating factor. However, under subsequent questioning by the district attorney, LeBlanc said that he "underst[ood] now" the idea of intoxication as a mitigating circumstance and could consider it "depending on the case." Mr. LeBlanc agreed that he would "give it its due weight based on the facts of this case." A review of Mr. LeBlanc's entire testimony shows that he would assess all of the evidence presented before making a decision. The colloquy reflects that the state successfully rehabilitated LeBlanc; accordingly, the challenge for cause was properly denied.
Assignments of Error Nos. 7, 10, and 11 are without merit.

ARGUMENT 2
In his next argument (assignment of error no. 35), defendant claims that statements made by the district attorney during voir dire and during the penalty phase closing argument "infected ... jury deliberations with an unconstitutional presumption of intent...." Specifically, on several occasions during voir dire, the district attorney made statements to the effect that "the law ... presumes that a person intends the natural consequences of his actions." The district attorney made a similar statement during penalty phase closing argument. Defense counsel failed to contemporaneously object to the district attorney's statements. Nonetheless, defendant argues that the district attorney's statements were prejudicial and unconstitutional under Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).
In Sandstrom, the United States Supreme Court found a jury instruction, "the law presumes that a person intends the ordinary consequences of his voluntary acts," suggestive of serious constitutional problems. The Court found that this instruction could be considered to be a mandatory presumption by the jury and, thus, improperly shift the burden of proof from the state.[6]
A misstatement of the law by the prosecutor does not prejudice a defendant if the judge subsequently admonishes or correctly instructs the jury. See State v. Edwards, 420 So.2d 663, 681 (La.1982) (district attorney's erroneous statement of the law on intent at closing argument cured by requested admonition); State v. Belgard, 410 So.2d 720, 725 (La.1982) (district attorney's erroneous statement of the law on intent at voir dire cured by requested admonition and correct instruction); State v. Gutter, 393 So.2d 700, 702-03 (La.1981) (district attorney's erroneous statement of the law on intent at closing argument cured by requested admonition and correct charge). In the instant case, defense counsel never objected to the state's Sandstrom-erroneous statement and, therefore, the district judge never admonished the jury. However, the judge read the jurors a correct statement of the law when he instructed them. We do not consider the misstatement of the law by the district attorney so dominant that the jurors could not adhere to their charged duty to accept and to apply the law as given by the court. La. C.Cr.P. art. 802(2). Under the circumstances, it cannot be said that the accused's *1240 right to a fair trial was not sufficiently protected. See La.C.Cr.P. art. 771.[7]
Assignment of Error No. 35 lacks merit.

ARGUMENT 3
In his third argument (assignment of error no. 34), defendant claims that the trial court erred by prohibiting the defense from examining venirepersons on issues of race bias. The record reflects that defense counsel began questioning prospective jurors on race bias, propounding a question about civil rights and integration. A venireperson responded and, after a brief discussion, counsel asked the venireperson how he felt about affirmative action. At this point, the district attorney asked to approach the bench. In defendant's rendition,[8] at the conference the district attorney objected to the line of questioning, and the judge sustained the objection. In any event, the defense asked no further questions about race bias. Defendant cites Turner v. Murray, 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986), and argues that the alleged restriction on questioning on racial matters violated his right to complete voir dire.
An accused in a criminal case has a constitutional right to a full and complete voir dire examination. La. Const. art I, § 17. The court, the State, and the defendant have the right to examine prospective jurors. La.C.Cr.P. art. 786; State v. Hall, 616 So.2d 664, 668-69 (La.1993). The scope of examination lies within the sound discretion of the trial court, id.; State v. Stucke, 419 So.2d 939, 947 (La.1982); State v. Robinson, 404 So.2d 907, 911 (La.1981), and reviewing courts owe a district judge's determinations on the scope of voir dire great deference and may not disturb them in the absence of a clear abuse of discretion. Id.
Assuming that the bench conference went as defense counsel now attests, and assuming that counsel objected to the ruling or that he need not have objected because the error has an impact on the selection of the sentencer and, consequently, the sentencing phase, the facts of the instant case do not show an abuse of the district judge's discretion. Though defendant correctly points out that the Supreme Court in Turner v. Murray stated that the "unique opportunity for racial prejudice to operate but remain undetected" in the "highly subjective, `unique individualized' " circumstances involved in capital sentencing requires trial courts to allow questions about venireperson's racial attitudes, the Court explicitly limited that rule to situations involving "a capital defendant accused of an interracial crime...." Turner, 476 U.S. at 35, 106 S.Ct. at 1688 (emphasis added).[9] The Turner v. Murray rule simply *1241 does not apply to defendant's case, involving the murder of two African-Americans by an African-American. Defendant does not suggest that any other "special circumstances," see Ham v. South Carolina, 409 U.S. 524, 525-26, 93 S.Ct. 848, 849-50, 35 L.Ed.2d 46, required the district judge to allow questioning on race bias as a matter of federal constitutional law.

CAPITAL SENTENCE REVIEW
Article 1, § 20 of the Louisiana Constitution prohibits cruel, excessive, or unusual punishment. La.C.Cr.P. art. 905.9 provides that this court shall review every sentence of death to determine if it is excessive. The criteria for review are established in La.Sup. Ct.R. 28, § 1, which provides:
Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
The state filed a Sentence Review Memorandum pursuant to La.S.Ct.R. 28 § 3(c); the defense did not file a sentence review memorandum. The district judge filed the Uniform Capital Sentence Report required by La.S.Ct.R. 28 § 3(a) and the Sentence Investigation Report required by La.S.Ct.R. 28 § 3(b). These documents indicate that defendant is a 34-year old black male who never married, but he fathered one child (now approximately eight years old) out of wedlock. After 1988 and 1985 simple battery convictions, defendant paid fines, but he never served a prison sentence. His record also reflects open aggravated battery, simple kidnapping, aggravated assault and simple battery charges which resulted from a 1986 arrest.

(a) PASSION, PREJUDICE, OR ANY OTHER ARBITRARY FACTORS
There is no evidence that passion, prejudice, or any other arbitrary factors influenced the jury in its recommendation of the death sentence. Nor has any argument to that effect been raised by defendant.

(b) AGGRAVATING CIRCUMSTANCES
The jury found five aggravating circumstances as to the murder of Rosetta Silas and three aggravating circumstances as to the murder of Freddie Richard, Jr.
As to count one, the murder of Rosetta Silas, the jury in its verdict found the following aggravating circumstances:
(1) The offender was engaged in the perpetration or attempted perpetration of aggravated burglary.
(2) The offender was engaged in the perpetration or attempted perpetration of armed robbery.
(3) The offender knowingly created a risk of death or great bodily harm to more than one person.
(4) The offense was committed in an especially heinous, atrocious, or cruel manner *1242 in that the victim was subjected to torture, serious physical abuse, or pitiless infliction of unnecessary pain and suffering.
(5) The victim was an (sic) witness to a crime alleged to have been committed by the defendant or possessed other material evidence against the defendant.
As for count two, related to the murder of Freddie Richard, Jr., the jury found the following aggravating circumstances present:
(1) The offender was engaged in the perpetration or attempted perpetration of aggravated burglary.
(2) The offender knowingly created a risk of death or great bodily harm to more than one person.
(3) The offense was committed in an especially heinous, atrocious or cruel manner in that the victim was subjected to torture, serious physical abuse, or pitiless infliction of unnecessary pain and suffering.
The evidence clearly proved that defendant knowingly created a risk of death or great bodily harm to more than one person. This aggravating circumstance exists when a single consecutive course of conduct by the offender contemplates and actually causes the death of one person and the death or great bodily harm of another. State v. Welcome, 458 So.2d 1235 (La.1983). Here, defendant killed two persons and attempted to kill three other persons in a single consecutive course of conduct. The state presented more than sufficient evidence to demonstrate the aggravating circumstances the jury found. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
Since we find this aggravating circumstance is clearly supported by the record, we find it unnecessary to address whether the jury erred in finding the offender was engaged in the perpetration or attempted perpetration of aggravated burglary, the perpetration or attempted perpetration of armed robbery, the victim was a witness to a crime alleged to have been committed by the defendant, or the offense was committed in an especially heinous, atrocious or cruel manner, since the failure of one aggravating circumstance does not invalidate others, properly found, unless introduction of evidence in support of the invalid circumstance interjects an arbitrary factor into the proceedings. State v. Martin, 93-0285 (La. 10/17/94), 645 So.2d 190, 201. Since the evidence supporting the other aggravating circumstances was part of the facts surrounding the murder, it is clear that admission of this evidence did not interject an arbitrary factor into the proceedings.

PROPORTIONALITY REVIEW
The federal Constitution does not require proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). However, comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana, State v. Burrell, 561 So.2d 692 (La.1990); State v. Wille, 559 So.2d 1321 (La.1990); State v. Thompson, 516 So.2d 349 (La.1987), though the Court has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in that one case, inter alia, a sufficiently "large number of persuasive mitigating factors." State v. Sonnier, 380 So.2d 1, 9 (La.1979); see also State v. Weiland, 505 So.2d 702, 707-10 (La.1987) (in case reversed on other grounds, dictum suggesting that death penalty disproportionate).
The state's Sentence Review Memorandum reveals that since 1978, four Rapides Parish juries (in addition to the jury in the instant case) have sentenced defendants to death. In State v. Moore, 432 So.2d 209 (La.1983), this Court upheld the conviction and sentence of a defendant who kidnapped, robbed, and shot to death a convenience store manager. In State v. Felde, 422 So.2d 370 (La.1982), the Court affirmed the conviction and sentence of a defendant who shot and killed a police officer who had just arrested him. In State v. Eaton, 524 So.2d 1194 (La.1988), the Court affirmed the conviction and sentence of a defendant who planned and carried out the murder of a minister in order to steal her car. In State v. Comeaux, 514 So.2d 84 (La.1987), the Court affirmed the conviction but reversed the death sentence of a defendant who raped *1243 and killed an elderly woman and killed her elderly sister. After a new penalty phase, another jury sentenced defendant to death. The case not yet been reviewed by this court.
A review of these other capital verdicts from Rapides Parish reveals that defendant did not receive a disproportionately harsh sentence. With the exception of Comeaux, the crimes' violence and depravity pale in comparison with the instant offense. Nothing in any of the post trial documents filed pursuant to La.S.Ct.R. 28 warrants reversal of defendant's death sentence.
After having considered the above factors, we are unable to conclude that the sentence of death in the instant case is disproportionate to the penalty imposed in other first degree murder cases in Rapides Parish, considering both the circumstances and the defendant.
Accordingly, based on the above criteria, we do not consider that defendant's sentence of death constitutes cruel, excessive, or unusual punishment.

DECREE
For the reasons assigned, defendant's conviction and sentence are affirmed for all purposes except that this judgment shall not serve as a condition precedent to execution as provided by La.R.S. 15:567 until (a) defendant fails to petition the United States Supreme Court timely for certiorari; (b) that Court denies his petition for certiorari; (c) having filed for and been denied certiorari, defendant fails to petition the United States Supreme Court timely, under prevailing rules, for applying for rehearing of denial of certiorari; or (d) that Court denies his application for rehearing.
NOTES
[*] Because of the vacancy created by the resignation of Dennis, J., now a judge with the United States Court of Appeals for the Fifth Circuit, there was no justice designated "not on panel" under Rule IV, Part II, § 3. The panel included Chief Justice Calogero and Associate Justices Marcus, Watson, Lemmon, Kimball, Johnson, and Victory.
[1] The assignments of error not discussed in this opinion do not represent reversible error and are governed by clearly established principles of law. They will be reviewed in an unpublished appendix which will comprise part of the record in this case.
[2] At the time of trial which was held approximately fourteen months after this incident, David was eleven years old and Frederick was 9 years old.
[3] Specifically, as to count one (the Silas murder) the jury found that:

1. The offender was engaged in the perpetration of attempted perpetration of aggravated burglary.
2. The offender was engaged in the perpetration or attempted perpetration of armed robbery.
3. The offender knowingly created a risk of death or great bodily harm to more than one person.
4. The offense was committed in an especially heinous, atrocious, or cruel manner in that the victim was subjected to torture, serious physical abuse, or pitiless infliction of unnecessary pain and suffering.
5. The victim was a witness to a crime alleged to have been committed by the defendant or [who] possessed other material evidence against the defendant.
[4] As to count two (the Freddie Richard murder), the jury found that:

A. The offender was engaged in the perpetration or attempted perpetration of aggravated burglary.
B. The offender knowingly created a risk of death or great bodily harm to more than one person.
C. The offense was committed in an especially heinous, atrocious or cruel manner in that the victim was subjected to torture, serious physical abuse, or pitiless infliction of unnecessary pain and suffering.
[5] Under La.C.Cr.P. art. 797(2), a defendant may challenge a juror for cause on the ground that "[t]he juror is not impartial, whatever the cause of his partiality." La.C.Cr.P. art. 797(4) provides a defendant may challenge a juror for cause on the ground that "[t]he juror will not accept the law as given to him by the court."
[6] This court considered an identical instruction in State v. Heads, 385 So.2d 230 (La.1980). The United States Supreme Court granted certiorari in Heads v. Louisiana, 444 U.S. 1008, 100 S.Ct. 654, 62 L.Ed.2d 637 (1980), and remanded the case to be considered in light of Sandstrom. Unable to say that the error was harmless beyond a reasonable doubt, we remanded the case to the district court for a new trial.
[7] Because this Court has determined that the misstatements of law made by the prosecutor in the penalty phase did not constitute reversible error, this Court does not need to reach the issue of whether review of identical unobjected to misstatements of law made during voir dire would be barred by our holding in State v. Taylor, 93-2201 (La. 2/28/96), 669 So.2d 364. Accordingly, we save that issue for another day.
[8] The court reporter did not record this bench conference. Moreover, counsel did not make an objection on the record. In an affidavit filed in this Court with appellate counsel's brief, trial counsel states that: he had put questions on race bias in his outline of questions to ask veniremen at voir dire; after he asked one venireman a few of the race-related questions, the district attorney asked to approach the bench; and after this bench conference, he (trial counsel) did not ask any more race-related questions. Trial counsel's affidavit continues:

When I reflect back upon this, I can state with confidence that the reason for abandonding this area of examination was that the court had sustained the prosecutor's objection to any questions dealing with race. I was not allowed to discuss with the jurors their feelings about integration, affirmative action, or the like. Since I was sensitive to picking jurors who would not be influenced by race prejudice and had incorporated into my outline these types of questions, the only reason for not proceeding with my plan was an unfavorable ruling by the court.
[9] Earlier Supreme Court opinions treating the restriction of voir dire questioning referred to "special circumstances ... inextricably bound up with the conduct of the trial" which would require a trial judge to allow the defense to question venireperson on racial or ethnic matters. Ristaino v. Ross, 424 U.S. 589, 596-97, 96 S.Ct. 1017, 1021, 47 L.Ed.2d 258 (1976). In Ristaino, 424 U.S. at 593-97, 96 S.Ct. at 1020-21, the armed robbery-aggravated battery-attempted murder of a white man by an African-American man did not satisfy the criteria of special circumstances. The Court stated that "[t]he Constitution does not always entitle a defendant to have questions posed at voir dire specifically directed to matters that conceivably might prejudice venireperson against him." 424 U.S. at 594, 96 S.Ct. at 1020. Instead, only if "there [is] a constitutionally significant likelihood that, absent questioning about racial prejudice, the jurors would not be" impartial does a district judge err in refusing to allow questions on such matters. 424 U.S. at 596, 96 S.Ct. at 1021.

No member of the Supreme Court, past or present, has ever suggested that the facts of the instant crime would require the trial judge to allow a broad inquiry into venireperson's racial attitudes. See, e.g., Turner v. Murray, 476 U.S. at 45, 106 S.Ct. at 1693 (Marshall and Brennan, JJ., concurring in part and dissenting in part) (stating belief that "a criminal defendant is entitled to inquire on voir dire about the potential race bias of jurors whenever the case involves a violent interracial crime."); Ross v. Massachusetts, 414 U.S. 1080, 94 S.Ct. 599, 38 L.Ed.2d 486 (1973) (Marshall, J., dissenting from denial of certiorari) (same). Additionally, defendant points to no case in which a court has found that restriction of voir dire on race matters in a trial for a crime in which the defendant and victims belonged to the same race constituted error.