745 So.2d 1160 (1998)
STATE of Louisiana
v.
Fredrick Domne GRADLEY.
No. 97-KA-0641.
Supreme Court of Louisiana.
May 19, 1998.
*1162 Lane Rutherford Trippe, Counsel for Applicant.
Richard Phillip Ieyoub, Attorney General, Charles F. Wagner, District Attorney, Monique Yvette Metoyer, Counsel for Respondent.
MARCUS, Justice.[*]
Fredrick Gradley was indicted for the first degree murder of Rita Rabalais in violation of La. R.S. 14:30. After trial by jury, defendant was found guilty as charged. A sentencing hearing was conducted before the same jury that determined the issue of guilt. The jury unanimously recommended that a sentence of death be imposed on defendant. The trial judge sentenced defendant to death in accordance with the recommendation of the jury.
On appeal, defendant relies on twenty-six assignments of error for reversal of his conviction and sentence.[1]

FACTS
On the morning of October 24, 1994, Leta Juneau became concerned when her eighty-two year old sister-in-law, Rita Rabalais, did not attend 8:00 A.M. daily mass, as was her custom. Immediately after the service, Leta went to Rita's home to check on her. When she arrived, she found the door to Rita's home unlocked. She entered the house and called to Rita, but neither Rita nor her pet dog responded. Various items were in disarray around the home and Leta became alarmed. She called her daughter, who shortly thereafter arrived with Leta's grandson, James Yarborough. James found Rita's pet poodle closed up in one of the home's bedrooms, cowering by the side of a bed. By that time, various other family members had arrived and gone through the house looking for Rita, to no avail. While searching about the house for his great-aunt, James noticed that a chest of drawers had been pulled from its usual spot against a wall and placed in front of the closet in Rita's bedroom. The police were called to investigate.
When the police arrived on the scene, James directed Officer James Bettevy to Rita's bedroom and pointed out the chest blocking the closet door. The officer moved the chest, opened the closet, and directed his flashlight inside. There Officer Bettevy and James Yarborough found the bludgeoned body of Rita Rabalais, covered with blood, in a slouched position on the floor of the closet.
The homicide division of the Alexandria police department soon arrived to collect evidence. Detectives J.D. Griffith and Ronald Beson took photographs, dusted for fingerprints, and recovered from the kitchen garbage can a knife, a knife sharpening rod, and a rubber glove bearing a latent palm print. They also found a bloody shoe print left on the floor of the home. The portion of the floor where the shoe print was found was removed by carpenters to be preserved as evidence. All of these items were introduced at trial.
An autopsy on the victim revealed that Rita had been repeatedly stabbed, slashed, and badly beaten. Her face and head bore evidence of multiple bruises and lacerations. There were four groups of fatal *1163 wounds. Repeated blows to the head caused massive bleeding to the brain. In addition, there were three fatal stab wounds, one on each side of the neck which had severed the carotid arteries and one to the left side of Rita's body, which had penetrated six inches and pierced her heart and lung. The coroner, Brenda Rheams, also testified to evidence of blunt trauma about the upper body, apparently inflicted with fists and a blunt object, as well as defensive wounds to the victim's arms. She verified that the victim's stab wounds were consistent with wounds that could have been inflicted by the kitchen knife recovered by Officers Griffith and Beson at the scene. She also confirmed that the trauma to the victim's brain could have been caused by blows with the knife sharpening rod found by the officers.
In the course of their investigation, police canvassed the neighborhood for information. They spoke to Ricky Swafford, a fourteen year old boy living in the area. Ricky testified at trial that he had known Rita and that she appeared to him to be about ninety years old. A few days before the murder, he had heard defendant and several other young men planning to rob and kill Rita as they hung out in the front yard of Lonnie Smith's house. Smith was Rita's next door neighbor. He heard Gradley say that he believed the victim had money, jewelry, and a gun and that he wanted to go in "the old lady house and kill her" and see what he could find in the home. Ricky testified that he heard virtually the same comments made by defendant in another conversation the day before the murder. On the morning of the murder, he saw defendant in the neighborhood wearing a white T-shirt with red stains on it.
The police went to defendant's home and left a message asking that he call the detectives. He did so and reported voluntarily to the police station for questioning the next day, December 9, 1994. After being advised of his rights, defendant gave a statement describing the murder of Rita Rabalais in graphic detail. He confessed that he had entered the victim's home with at least four other young men with the intention of robbing her. He had discussed the crime with one of the other perpetrators that morning, Cedric Howard, who had said, "come on, let's go kill this old woman and take her car." As he entered Rita's home behind the other attackers, they had already begun to beat her and she was calling out for help. She tried to run for the front door but she was caught by the hair and slammed to the floor where she was kicked, beaten, and hit in the head with a pipe. At some point Cedric Howard choked her with a wire. One of the perpetrators, Jerry Joseph, ran and got some knives out of the kitchen. Defendant admitted that he stabbed the elderly victim in the side and witnessed others in the group continue "cutting her all up." Then they pushed her into a closet and moved a dresser across the door. Defendant cleaned off the knife he had used and threw it and some hospital gloves worn during the murder into the kitchen garbage can. Then the attackers looked through the victim's "stuff" and her dresser, looking for the car keys. Defendant confirmed Ricky Swafford's testimony that he had seen him in the neighborhood that morning after the murder.
The state's expert forensic metallurgist, William Tobin, confirmed that the knife and knife sharpening rod found in the kitchen garbage can came from a knife block on the counter of the victim's kitchen. FBI special agent, Gary Kanaskie, testified that the bloody shoe print left at the scene of the crime was consistent with prints left by the Adidas sneakers seized from defendant pursuant to a warrant. Tim Trozzi, an FBI fingerprint expert, testified that the palm print found on the rubber glove retrieved from the victim's kitchen garbage can matched defendant's palm print.
Police also secured the statement of Jerry Joseph, one of the men who participated in the crime. Joseph was allowed to plead *1164 guilty to manslaughter, which carries a maximum sentence of forty years in prison at hard labor, in exchange for his cooperation in giving evidence of the crime. This witness testified at trial that he had known defendant for about one week before the murder. One evening outside a local club, he heard defendant and others talk about robbing a lady who lived on Kelly Street. He heard defendant and Cedric Green planning the robbery; the plan was that if Rita recognized Cedric, who lived in the neighborhood, she would be murdered. On the morning of the murder, he met up with the group again and saw part of the group enter the rear of the victim's home after Cedric Howard had "messed with the back door" with a screwdriver. The rest of the group, including defendant, entered the front door. When Joseph went into the house, the victim was surrounded and was being beaten about the head with a pipe, kicked in the face, and punched. He saw defendant come into the room from another part of the house with the murder weapon, a kitchen knife. As one of the perpetrators held Rita up, he saw defendant's arm go up with knife in hand and then saw Rita fall. Jerry Joseph testified that money was taken from the house. He believed about $800.00 was taken and he personally got $100.00.
Defense counsel admitted during opening statements that Gradley had confessed to being at the scene of the crime and inflicting one of the victim's fatal wounds. However, counsel suggested that the stabbing was without specific intent and that it occurred as the victim tried to grab on to the defendant. The jury was asked to find the defendant guilty of second degree murder or manslaughter rather than first degree murder.

PRETRIAL ISSUES

Assignment of Error No. 11
Defendant contends the trial judge erred in appointing two attorneys to represent him in this capital case who allegedly had not been certified in accordance with La. Sup.Ct. R. XXXI. Rule XXXI, which became effective July 1, 1994, sets forth Standards Related to the Effectiveness of Indigent Defense Counsel. At Section J(1)(a), the rule provides that in any capital case involving an indigent defendant, the court shall appoint no less than two attorneys who have been certified by the Louisiana Indigent Defender Board as qualified to serve in capital cases. Section J(1)(c) provides that if the court determines that a lawyer initially appointed is not currently certified, the court shall relieve the lawyer of the appointment and appoint the lawyer or lawyers recommended by the chief executive officer of the Louisiana Indigent Defender Board.
Defendant filed an application for a court appointed attorney on December 20, 1994. Ms. Katherine Geary was appointed to represent him and he was arraigned on February 17, 1995. By April, 1995, Mr. James Gravel had also been appointed to represent the defendant. In February 1996, Mr. Gravel passed away and Ralph Kennedy was appointed to take his place on the defense team.
Defendant has presented no evidence that his trial counsel, Ms. Geary and Mr. Kennedy, were not certified to serve in a capital case at the time of trial. However, even assuming that they were not certified, defendant's assignment of error lacks merit. Section R of Rule XXXI specifically provides that notwithstanding its provisions, failure to comply with the Rule shall not be a ground for an attack on a conviction:
The Rule shall not be construed to confer substantive or procedural rights in favor of any accused beyond those rights recognized or granted by the United States Constitution, the Louisiana Constitution, the laws of the state, and the jurisprudence of the courts.
The system, programs, rules, procedures and standards included in, encompassed by, and resulting from this Rule shall not form a basis for a procedural *1165 or substantive attack in any case or proceeding pending or instituted in the Louisiana criminal justice system on or after the date this Rule is promulgated.
Accordingly, even assuming that trial counsel had not been certified at the time of trial, the failure of certification does not constitute a ground for reversal of defendant's conviction.[2]
This assignment of error has no merit.

Assignment of Error No. 15
Defendant contends the trial judge erred in denying his motion to suppress his confession. He argues that his recorded statement, in which he admitted stabbing the victim in the side, was not freely and voluntarily given because he was induced to make the statement by promises that he would only be charged with manslaughter.
At the hearing on defendant's motion to suppress, all three of the police officers present at the time the statement was given appeared. Det. Donald Weatherford testified that defendant had called him at 9:00 A.M. on the morning of December 9, 1994 to advise that he would be coming in to answer questions. Weatherford met him in the lobby of the station house at about 11:55 A.M. and walked with Gradley down the hall to the office he shared with Det. Gary Billingsly. Dets. Billingsley and Darrell Jones were already in the office. Defendant concedes he was not under arrest at this time.
Once in the office, defendant was advised of his Miranda rights using an official "Advice of Rights Form" which was admitted into evidence at the hearing. As defendant was read his rights, Gradley initialed each of them on the form. Then defendant signed the "Waiver of Rights" section of the form, waiving his right to counsel, indicating a desire to make a statement, and affirming that no threats or promises had been made. Det. Weatherford testified that he told defendant they were investigating the murder of Rita Rabalais, that they wanted to ask him questions about the homicide, and that he would be charged with first degree murder. He denied that any threats, force, or coercion was used and clearly stated that no promises, inducements, or deals were offered to defendant in exchange for his statement. The three officers talked to defendant about the incident and proceeded to take a recorded statement at 12:25 P.M. The recorded statement was about nine minutes long. Det. Weatherford explained that the story defendant recounted involved at least four other people with similar names. The officers wanted to get the story and people involved clear before taking the formal recorded statement. Only about 30 minutes elapsed between defendant's arrival at the station and the commencement of the recorded statement. During that time, defendant was advised of his rights, completed the necessary paperwork, waived his Miranda rights, and informally told the officers what occurred in connection with the murder of Rita Rabalais. Det. Billingsly likewise testified that defendant's confession was free and voluntary. He was present throughout the advice and waiver of rights, initial questioning, and taking of the recorded statement. No threats, force, coercion, promises, or inducements were made by anyone. Det. Darrell Jones testified that he had known defendant for about four years. It looked as if something was wrong and he recalled Gradley saying that he had some things to get off his chest that were bothering him. Det. Jones testified that he was present throughout the entire time Gradley was in the office and that no threats, force, coercion, promises, or inducements of any kind were given in exchange for defendant's statement.
Defendant testified at the hearing for the limited purpose of calling into question the free and voluntary nature of his statement. He claimed he had been promised *1166 he would be charged with manslaughter and would only get 20 years for the murder and that these promises were made before the recorded statement was taken and after Det. Jones had left the office.
The state recalled Det. Billingsly in rebuttal. He specifically denied that any of the officers had promised defendant any deal or that there had been any assurance or discussion of defendant's being charged with manslaughter if he cooperated with the police.
The trial judge heard the testimony of the three officers and defendant on the issue raised. He reviewed the Advice of Rights Form which defendant signed and which included a statement that no promises had been made to defendant. He also listened to the tape recorded statement made by defendant. At the end of the statement the following exchange took place:
Q: Was there any force, threats, or promises been made to get you to give me this statement or was it of your own free will?
A: On my own free will.
Q: And it was done with your rights in mind, you still remember what your rights are?
A. Yes sir.
Based on all of the evidence, the trial judge denied defendant's motion to suppress his confession, noting that the testimony of the officers was straight forward and consistent. Defendant's testimony contradicted his own recorded statement and the statement in the Advice of Rights Form he had signed. He ruled:
[t]he court resolves this credibility question in favor of the officers and finds that there is no merit to the motion to suppress and denies the motion.
It is well settled that before the state may introduce a confession into evidence, it must affirmatively show that the statement was free and voluntary and not the result of fear, duress, intimidation, menace, threats, inducements, or promises. La. R.S. 15:451; State v. Simmons, 443 So.2d 512 (La.1983). The state must specifically rebut a defendant's allegations of misconduct. State v. Vessell, 450 So.2d 938 (La.1984). However, where conflicting testimony is offered, credibility determinations lie within the sound discretion of the trial judge, and his ruling will not be disturbed unless clearly contrary to the evidence. Vessell, 450 So.2d at 943.
In the instant case, defendant argues that the testimony of the officers at the motion to suppress and later at trial as to exactly what transpired between the time he appeared at the station and the time his recorded statement was taken 30 minutes later is inconsistent. Defendant suggests that because of these alleged inconsistencies, the officers' testimony should be disregarded and Gradley's accepted as true. He asserts that at trial, the officers made it seem as if defendant told his story right away and just repeated it on tape, while at the earlier motion to suppress, they testified that they had spoken to defendant to get the facts straight before the recording.
After reviewing the record, we do not agree that the testimony of the officers, taken as a whole, is inconsistent. All three officers testified clearly that no promises whatsoever were made in exchange for defendant's statement. Det. Billingsly specifically refuted defendant's claim that he was promised a charge of manslaughter if he cooperated. In our view, the trial judge was well within the bounds of his discretion in denying defendant's motion to suppress and in permitting the introduction of defendant's confession at trial.
 Assignment of Error No.
 15 is without merit.
 VOIR DIRE ISSUES
 Assignments of Error Nos.
 6, 7, 8, 9, and 10
Defendant claims the trial judge improperly granted five of the state's challenges for cause made under Wainwright v. Witt, *1167 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Defendant argues that the five prospective jurors were improperly excused and that there was no showing that the excluded jurors' attitudes about the death penalty would substantially impair their ability to follow the judge's instructions.
A prospective juror is properly excluded for cause because of his/her views of capital punishment when the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). La.Code Crim. P. art. 798(2)(b). A capital defendant's rights under the Sixth or Fourteenth amendments to an impartial jury prohibits the exclusion of prospective jurors "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). It is reversible error when such a prospective juror is excluded, even if the state could have used a peremptory challenge to strike the potential juror. Gray v. Mississippi, 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987). However, a trial judge's determinations about a venireman's fitness for service are owed great deference where they are fairly supported by the record. Witt, 469 U.S. at 424, 105 S.Ct. 844; State v. Lindsey, 543 So.2d 886 (La.1989). Even where a prospective juror declares his ability to remain impartial, a challenge for cause will be upheld if the juror's responses as a whole reveal facts from which bias, prejudice, or inability to render judgment according to the law may be reasonably implied. A trial judge has great discretion in determining whether sufficient cause has been shown to reject a prospective juror. Such determinations will not be disturbed unless a review of the voir dire as a whole indicates an abuse of discretion. State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116.
Our review of the record demonstrates that the trial judge did not abuse his discretion in granting the state's challenges for cause as to each of the prospective jurors in dispute. Prospective juror Rebecca Maricle testified that she would require the state to meet a higher burden of proof than "beyond a reasonable doubt." She acknowledged that she could vote for capital punishment in some circumstances but would require more proof than "beyond a reasonable doubt" in order to do so. Ms. Maricle stated that she would follow the instructions of the judge as to everything but the state's burden of proof. In response to questions by defense counsel, she replied:
I just think that their evidence would have to be so strong that there would be, I mean, justhe'd just have to have done it. That there would be no other ifs, ands and buts about it.
While some of the defense questions were framed in terms of reasonable doubt, the witness never retreated from her position that more than proof "beyond a reasonable doubt" would be required by her in a capital case.
Prospective juror Tommy Lagrange similarly testified that because of the potential for imposition of the death penalty, he probably would hold the state to a higher burden of proof than "beyond a reasonable doubt." He also testified that he was leaning toward feeling that his conscience would impair him from ever considering the death penalty. While defense counsel was able to get a broad statement that he would follow the judge's instructions, the potential juror was never rehabilitated specifically with respect to his ability to impose the death penalty or the burden of proof he would require the state to bear.
Prospective juror Franklin Williams testified that the only way he could impose the death penalty was if the *1168 offense was personal or against a member of his immediate family. Otherwise, he did not believe he could do it. He also stated that in a first degree murder case he believed he would require more than proof "beyond a reasonable doubt." Mr. Williams indicated that he could only return a death penalty for a hideous crime like a "Charles Manson crime." In considering the challenge for cause, the trial judge commented that he did not believe the prospective juror's later answers indicated a change from his original attitude that he would hold the state to a higher burden of proof than that required by law.
Prospective jurors Michael Sawrie and Susie Washington both stated that their beliefs would prevent them from returning a death verdict. Sawrie indicated that even if he thought a person deserved death, his Christian faith would prevent him from taking part in a decision that would end a human being's life. Washington testified that she did not know if she could impose the death penalty. On further questioning she indicated that it would bother her and that she could not vote for a death penalty under any set of circumstances. In response to questioning by defense counsel, both of these prospective jurors responded "yes" to a question of whether they could render a fair and impartial verdict in connection with the death penalty. However, they did not actually say they could impose the death penalty.
As to each of the prospective jurors referred to above, the trial judge granted the state's challenge for cause. Having read the entirety of the responses of the veniremen, we are unable to say that the trial judge abused his discretion in concluding that the views of these prospective jurors would substantially impair their abilities to follow the judge's instructions in a capital case. Tart, 672 So.2d at 124.
These assignments of error are without merit.

TRIAL ERRORS

Assignment of Error No. 16
Defendant contends the trial judge improperly admitted victim-impact evidence during the guilt phase of the trial. He argues that permitting the testimony of family members, allowing the account by the victim's great-nephew of his discovery of the body, and the showing of a portion of a videotape depicting a family reunion was improper and prejudicial.
At the beginning of its case in chief, the state called various family members of the victim who had gone to her home to look for her on the morning of the murder. Leta Juneau was the first to suspect that something was wrong when Rita did not appear at daily mass. She went to the house, entered the unlocked door, and found the home in disarray, supporting the state's contention that there had been a burglary and a robbery. This witness also testified to the age of the victim, one of the elements of the crime. The victim's sister, Lurline Mowad, testified that she came to the house and noticed the disarray. She likewise confirmed the victim's age and added that the victim had a car, the object of the robbery according to defendant's confession. Sharon Yarborough, the victim's niece, testified that when she arrived she saw things turned over in the den and furniture moved in the bedroom. She also described how Rita's pet poodle was found closed up in the front bedroom of the house and again confirmed the victim's age. Richard Juneau, a nephew, testified about the knife block his mother had given him when the family disposed of Rita's possessions after the murder. He explained that he had given it back to his mother so that she could transfer it to the police for testing.
The testimony of these witnesses was very brief, nondramatic, and recounted facts about the crime scene and elements of the state's case. The testimony did not describe the character of the victim or the impact of the crime on the surviving *1169 family members. Thus, it is not correctly characterized as victim-impact evidence and was properly admitted at the guilt phase of the trial.[3]
The state also called James Yarborough, the victim's great-nephew, to testify as to his activities on the morning of October 24, 1994. He described going through the victim's house looking for her. When the police arrived, he pointed out a chest of drawers pulled across the front of his great-aunt's closet blocking entry into the closet. He recounted how the officer moved the chest, opened the door, and directed his flashlight inside the closet. He then testified:
I didn't really see a person. It was like a figure of a person. I saw white and red. And it would appear like someone slouching over. And I just blacked out.
In our view, the factual testimony offered by James Yarborough describing the initial investigation of the crime and the discovery of the victim's body was clearly admissible. His testimony was not given in the context of describing the impact on him of the victim's death and is not properly characterized as victim-impact evidence.
Defendant also complains about the trial judge's decision to allow the state to play a portion of a videotaped family reunion. The state claimed that it was entitled to use the videotape as proof of the victim's age, notwithstanding defendant's offer to stipulate to her age, since defendant was charged with first degree murder by virtue of having committed the murder of a person over the age of sixty-five. However, the state had already presented testimony of several family members as to the victim's age and was prepared to introduce the testimony of the secretary of the church where the victim was baptized establishing that the victim was 82 years old at the time of her death. In view of the other evidence of age available and defendant's willingness to stipulate to the victim's age, the portion of the tape showing the victim stating her own age might be considered to be cumulative. Nevertheless, a review of the record demonstrates that only a very brief portion of the tape was shown. The jury saw the victim stating her age and the tape continued playing just long enough for James Yarborough to leave the witness stand and identify his great-aunt on the film. At that point, the film was stopped pursuant to defense counsel's objection. After discussion of the objection, the state made no further attempt to show other segments of the videotape. We are satisfied that even if admission of the brief portion of the videotape was cumulative, there was clearly no prejudice to defendant.
These assignments of error are without merit.

SENTENCE REVIEW
Article I, section 20 of the Louisiana Constitution prohibits cruel, excessive, or unusual punishment. La.Code Crim. P. art. 905.9 provides that this court shall review every sentence of death to determine if it is excessive. The criteria for review are established in La. Sup.Ct. R. 28, § 1, which provides:
Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and

*1170 (c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

(a) PASSION, PREJUDICE OR ANY OTHER ARBITRARY FACTORS
There is no evidence that passion, prejudice or any other arbitrary factors influenced the jury in its recommendation of the death sentence for the murder of Rita Rabalais.

(b) STATUTORY AGGRAVATING CIRCUMSTANCES
The jury in its verdict found the following aggravating circumstances:
The offender was engaged in the perpetration of an aggravated burglary and armed robbery. La.Code Crim. P. art. 905.4 A(1);
The offense was committed in an especially heinous, atrocious or cruel manner. La.Code Crim. P. art. 905.4 A(7).
The jury found the state had proven that both an armed robbery and an aggravated burglary had occurred. Defendant admitted in his confession that he entered the home of the victim with the intent to rob her and armed himself with a dangerous weapon after entry. He further admitted that the group searched the house for valuables after killing the elderly victim. Ricky Swafford testified that he had heard defendant say he wanted to kill the old lady and go in her house where he expected to find money, jewelry, and a gun. Jerry Joseph, one of the perpetrators, testified that money was taken from the home. He explained that the first wave of attackers entered the rear of the house after Cedric Howard had "messed with" the back door with a screwdriver. The victim's relatives testified that the rear door was unlocked when they arrived at the scene. Accordingly, the evidence amply supported a finding that the murder took place while defendant was engaged in the perpetration of an armed robbery and aggravated burglary. Thus the jury was clearly justified in finding the aggravating circumstance set forth in La.Code Crim. P. art. 905.4 A(1).
Since we find that one aggravating circumstance was clearly supported by the evidence, we need not address whether the jury erred in finding that the murder was committed in an especially heinous manner. The failure of one aggravating circumstance does not invalidate others, properly found, unless introduction of evidence in support of the invalid circumstance interjects an arbitrary factor into the proceedings.[4]State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190. Since evidence of the manner of Rita Rabalais' death was part of the essential facts surrounding the murder, the admission of this evidence clearly did not interject an arbitrary factor into the proceedings.

(C) PROPORTIONALITY TO THE PENALTY IMPOSED IN SIMILAR CASES
Federal constitutional law does not require a proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Nonetheless, La. Sup. Ct. R. 28, § 4(b) provides that the district attorney shall file with this court a list of each first degree murder case tried after January 1, 1976 in the district in which sentence was imposed. The state's list reveals that six first degree murder cases were tried to a jury in the Ninth Judicial District Court for the Parish of Rapides since January 1, 1976. The jurors of the Ninth Judicial District recommended the death penalty in five of the six cases.[5]
*1171 Four of the murder cases in which capital verdicts were returned involved brutal murders committed in the course of aggravated burglaries and/or armed robberies. One of the cases involved a defendant who was eighteen years old at the time of the murder and who was mildly retarded. State v. Eaton, 524 So.2d 1194 (La.1988). While those cases are not identical to this one, they share sufficient similarities to demonstrate that defendant's sentence of death in this case was not disproportionate.
The Uniform Capital Sentence Report and the Capital Investigation Report indicate that defendant is a black male who was eighteen years old at the time of the murder. He was living with his mother and half brother at the time and was enrolled in a local high school where he was placed in classes for learning disabled students.
Defendant had an extensive juvenile record going back to the age of twelve. One of his juvenile convictions involved the armed robbery of an elderly stroke victim living in defendant's neighborhood, during which defendant threatened the victim with a butcher knife taken from the victim's kitchen. He also had simple burglary convictions as a juvenile and as an adult.
Three psychologists testified about defendant's mental status. One opined that defendant was mildly mentally retarded with an IQ in the mid-sixties range. However, this psychologist testified that the portion of the test measuring "social comprehension" demonstrated a score considerably above the other areas. This portion of the test measured abilities such as the ability to understand laws and regulations. Two others psychologists testified that defendant's IQ scores were in the borderline to low average range of 75 to 80. All of the psychologists testified that defendant was capable of distinguishing right from wrong and making decisions based on those distinctions. Police officers that had dealt with defendant testified that he had never appeared to be mentally retarded in their dealings with him.
After having considered the above factors, we are unable to say that the sentence of death imposed in the instant case is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
Hence, based on the above criteria, we do not consider defendant's sentence of death for the murder of Rita Rabalis was cruel, excessive, or unusual punishment.

DECREE
For the reasons assigned, defendant's conviction and death sentence for the murder of Rita Rabalais are affirmed for all purposes except that this judgment shall not serve as a condition precedent to execution as provided by La. R.S. 15:567 until (a) defendant fails to petition the United States Supreme Court timely for certiorari; (b) that court denies his petition for certiorari; (c) having filed for and been denied certiorari, defendant fails to petition the United States Supreme Court timely, under their prevailing rules, for applying for rehearing of denial of certiorari; or (d) that court denies his application for rehearing.
NOTES
[*] Johnson, J., not on panel. Rule IV, Part 2, § 3.
[1] The assignments of error not discussed in this opinion do not represent reversible error and are governed by clearly established principles of law. They will be reviewed in an appendix which will not be published but will comprise part of the record in this case.
[2] The Uniform Capital Sentence Report filed in this case demonstrates that both of defendant's trial counsel had over 10 years experience.
[3] "Victim impact evidence" is a term of art used to describe evidence of the character of the victim and the effect of the victim's death on the victim's family. Such evidence is relevant and admissible at the penalty phase of a trial in order to permit the jury to meaningfully assess defendant's moral culpability and blameworthiness. State v. Bernard, 608 So.2d 966 (La.1992).
[4] We do not by our treatment of only one aggravating circumstance imply that the other aggravating circumstance found by the jury was invalid.
[5] State v. Felde, 422 So.2d 370 (La.1982) (Defendant found guilty of killing a policeman.); State v. Moore, 432 So.2d 209 (La.1983) (Defendant found guilty of killing a store clerk in the course of an armed robbery.); State v. Comeaux, 514 So.2d 84 (La.1987) (Defendant found guilty of burglary and the beating death of two elderly victims in connection with their rape. The conviction was reversed; defendant was retried and again sentenced to death. The case is now on appeal to this court.); State v. Eaton, 524 So.2d 1194 (La. 1988) (Eighteen year old defendant who was mildly retarded with an I.Q of 71, but who knew right from wrong, found guilty of murder of minister in the course of robbery and aggravated rape.); State v. Roy, 95 KA 0638 (La. 10/04/96), 681 So.2d 1230 (Defendant found guilty of brutal double homicide after he broke into a home.)