774 So.2d 1105 (2000)
STATE of Louisiana
v.
Daveon Deshan McCULLOUGH.
No. CR00-983.
Court of Appeal of Louisiana, Third Circuit.
December 6, 2000.
Rehearing Denied January 24, 2001.
*1107 James Buck, Assistant District Attorney, Alexandria, LA, Counsel for Plaintiff/Appellee, State of Louisiana.
John M. Lawrence, Shreveport, LA, Counsel for Defendant/Appellant, Daveon Deshan McCullough.
Court composed of Judge ULYSSES GENE THIBODEAUX, Judge OSWALD A. DECUIR and Judge JIMMIE C. PETERS.
THIBODEAUX, Judge.
A jury unanimously convicted Defendant, Daveon Deshan McCullough, of the second degree murder of Rita Rabalais after he and three codefendants[1] were charged by grand jury indictment with first degree murder. He appeals his conviction on numerous grounds and also appeals the denial of his motion for a change of venue.
We affirm.

*1108 INSUFFICIENCY OF THE EVIDENCE
The Defendant filed a Motion for Post-Verdict Judgment of Acquittal contending the evidence presented was insufficient to support a conviction of second degree murder. The motion was denied. The Defendant claims the evidence failed to establish that he desired "the natural and probable consequences of death for the victim to follow his actions" and that the evidence did not show he was a principal to the offense. Additionally, the Defendant claims there was no evidence to show he had committed or was attempting to commit an aggravated burglary because the evidence did not prove he was at the scene of the crime.
When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983); State v. Duncan, 420 So.2d 1105 (La.1982); State v. Moody, 393 So.2d 1212 (La. 1981). It is the role of the fact finder to weigh the respective credibility of the witness. Therefore, the appellate court should not second-guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. See King, 436 So.2d 559, citing State v. Richardson, 425 So.2d 1228 (La.1983).
State v. Lambert, 97-64 (La.App. 3 Cir. 9/30/98); 720 So.2d 724, 726-727.
The victim's body was discovered by her sister-in-law, Leta Juneau, Ms. Juneau's daughter, Sharon Yarbrough, and Ms. Yarbrough's son, along with a police officer who had been called to the victim's residence on October 24, 1994.
Doctor George McCormick II, a forensic pathologist and the coroner in Caddo Parish, was accepted as an expert in the field of forensic pathology. He concluded that several stab wounds to the victim's neck and chest areas were fatal.
Palm prints found on rubber gloves recovered from a garbage can in the victim's kitchen were linked to Fredrick Gradley. Impressions on the floor also corresponded in design and size to Gradley's sneakers.
Detective Gary Billingsley, who was working in the detective division of the Alexandria Police Department on October 24, 1994, testified that on December 9, 1994, he interviewed Fredrick Gradley. After getting a statement from him, he obtained warrants for first degree murder for Jerry Joseph, Joseph General, Joseph Green and Cedric Howard. On June 22, 1995, he spoke to Jerry Joseph and Mr. Joseph identified several persons from a lineup. After Mr. Joseph made the identifications, arrest warrants were secured for the Defendant, Fredrick Bush, Lonnie Simmons, Jr., and Joseph Michael Elie III. Detective Billingsley testified on cross-examination that the Defendant's footprints did not match the footprints found at the crime scene. He further testified that Fredrick Gradley admitted he went in the kitchen and got the knives and he said that Jerry Joseph put the victim in the closet. Initially, Jerry Joseph denied involvement in the murder, but on June 22, 1995, he admitted his involvement. He implicated the five individuals that Fredrick Gradley had referred to and four more, including the Defendant. According to Detective Billingsley, Jerry Joseph, Joseph General, Cedric Howard and Joseph Green had all either pled guilty or been convicted of the crime at the time of the Defendant's trial, but none of them other than Jerry Joseph named the Defendant. According to Detective Billingsley, none of the individuals other than Jerry Joseph told him that gloves were used, that they had cleaned up after the offense, that they had split up money or that they went to school afterwards. *1109 Jerry Joseph provided nicknames of the people involved and Detective Billingsley and others had to go through nickname files to figure out who they were. Joseph named a person, but they could not understand if he was saying David or Daveon. When asked why they put the Defendant's picture in the lineup, Detective Billingsley explained that they realized the Defendant was a half brother to Fredrick Bush and Joseph had named Fredrick.
Jerry Joseph testified that at the time of trial, he was incarcerated for the murder of the victim. He said he was arrested on a charge of first degree murder but pled guilty to manslaughter. According to Mr. Joseph, he entered a plea agreement with the State. In 1994, Mr. Joseph was twenty-three and selling crack cocaine for a living. Prior to the plea he entered on the manslaughter charge, he had never pled guilty or been convicted of anything.
Joseph testified he heard about the murder from Fred Gradley and Ced Howard. According to Jerry Joseph, Gradley, Howard, Green, Joe General, Mike Elie, Lonnie Simmons, Fred Bush and the Defendant went to his house. The group then went to a club (Eat-A-Bite) about two to three blocks from Joseph's house. Joseph and Joe General went in the club and got some beer and after they came out, they heard a conversation about a woman on Kelly Street who had a lot of money. According to Mr. Joseph, they said they were "scoping her out, like watching her house, stealing...." Shortly thereafter, Joseph testified that they were talking about robbing the lady. According to Joseph, he was just listening to this conversation and they were not talking to him. He later explained that "they" were Ced Howard and Fred Gradley. After this, he drank some beer and smoked some marijuana.
According to Mr. Joseph, he did not mind robbing drug dealers, but he was not interested in robbing the old woman on Kelly Street because she did not have anything he wanted. He then stated, "See, I was robbing her for dope, because that was money. I'm talking about money."
Mr. Joseph testified that everyone left after Ced Howard hollered, "Let's go to Kelly Street, back on Kelly Street." The only two left there were Mr. Joseph and Joe General. General told Joseph that "it was going down in the morning." According to Mr. Joseph, he then consumed two 40 ounce beers and got a bicycle and rode by General's house, but he was not there. Mr. Joseph proceeded to ride the bicycle past Bolton High School and down Chester Street. At some point, when looking for someone to sell drugs to, he asked someone what time it was and they told him it was about 5:00 or 6:00. Joseph confirmed that this was in the early morning hours. Mr. Joseph then saw Joe General and Fred Gradley talking by a brick church on Chester Street. Ced Howard came around the corner and a couple of minutes later, Joe Green arrived. Joe General said something about the woman on Kelly Street and everyone started hollering, "let's go by Jay Lowe." Jerry Joseph explained that this is Lonnie Simmons and he was supposed to live by the woman on Kelly Street. Jerry Joseph, Joe Green, Fred Gradley, Ced Howard and Joe General were the only ones there at first and they were waiting for Lonnie to come out. Mike Elie arrived followed by Fred Bush and the Defendant. According to Mr. Joseph, there were more people present than the ones he named.
Mr. Joseph testified that he went to the corner and when he returned everyone was on the side of the house, laughing. He went back across the street and when he returned he saw Ced on the side of the house with a screwdriver and Lonnie "had the card." Mr. Joseph testified that he went back and sat on the porch across the street and he saw Ced Howard, Fred Gradley, Joe Green, Joe General and Mike Elie come around in the front. He said it appeared they were "messing with the door" and they entered the house through the front door. Mr. Joseph then went on *1110 the side of the house and the back door was open. Lonnie Simmons was standing there and they heard rumbling in the house, like someone fell. Mr. Joseph entered the house and saw Joe General hitting a woman in the head with his fist. The woman was holding onto Fred Gradley's T-shirt and Ced hit her with a pipe and she fell. Ced Howard told Joe Green he'd "better get some more of this" and Joe Green ran and kicked her. Mike Elie had already kicked the victim when she was on the floor and the Defendant jumped in and picked her up. When the Defendant was picking her up, Lonnie Simmons walked over and punched her. Fred then came up with a knife and "when the knife went up" the victim fell. Joe then got the Defendant a little towel because he said his hand was bleeding. According to Mr. Joseph, Joe General, Mike Elie and the Defendant had gloves on that looked like "doctor gloves."
Mr. Joseph testified that when they were leaving, he saw the Defendant take a stick and knock some things off the dresser. Joe General was "wiping on the side, like the wall, wherever they touched at."
William Wansley, who at the time of trial was incarcerated for his conviction on one count of forgery and one count of unauthorized use of an access card, testified that he had been previously convicted for other offenses in this state and in other states. In April of 1998, he was housed in the Rapides Parish Detention Facility for a week. At one point, he shared a cell with the Defendant. Mr. Wansley testified that the Defendant asked him if it was possible that he would get a separate trial from the other defendants. Mr. Wansley testified that the Defendant told him that he felt he could "beat the charge" if he had a separate trial because during the commission of the crime, he cut his hand on a knife and there was a cloth found in the trash, but when it was examined, the DNA did not match him. The Defendant told Mr. Wansley that the crime was a gang initiation where everyone took turns stabbing and beating an old lady believed to have money. The Defendant further informed Mr. Wansley that they threw some of the knives in the river and that they put a small dog in the closet "when they did it." According to Mr. Wansley, this was the first time he had heard about this particular incident and he was not promised help with his charge. Further, he testified that he did not feel threatened, but there could be repercussions in the facility where he was housed because there were a lot of people who knew about "it" and there were gangs and violent people there. The Defendant pointed out his brother to Mr. Wansley one day in a holding cell and told him that his brother was also involved. According to Mr. Wansley, the Defendant never did anything to make him dislike him.
On cross-examination, the Defense questioned Mr. Wansley about his criminal history and the offenses listed on his rap sheet. Although Wansley denied committing some of the crimes listed, he admitted to numerous convictions including, but not limited to theft by receiving stolen goods, grand theft auto, forgery and possession of marijuana. Defense counsel also questioned Wansley about his reasons for telling the District Attorney about the information prisoners have provided to him.
Mr. Wansley explained:
A. Uh, the seriousness of the crime, for one. Also, uh, uh, itit weighed heavily on my conscious, uh, I have a Christian upbringing, and I don't condone murder. Although I may have, uh, broken the law at times, uh, I'mI'm notnot guilty of any kind of violence or violent crime. And I don't condone murder, and I don't believe, uh, that what was done was right. And, uh, although I may have been, as you say, dishonest at times, I wouldn't lie about a murder. That's, uh, a very serious thing.
The Defendant testified that he was seventeen in 1994 and twenty-two at the time of trial. He testified he is from California, *1111 having lived there for nine years. He then moved to New Mexico and on to Alexandria, Louisiana. He has also lived in Natchitoches, Louisiana. According to the Defendant, he has not discussed this case with any of the inmates in the jail because his lawyers told him not to. The Defendant testified that he knows Jerry Joseph from the streets since September of 1994 and "also in here." He maintained that he is not friends with Jerry and did not run with Jerry because he did not associate with Jerry's crowd and Jerry was older than him. The Defendant said he never had problems with Jerry out on the street, but in 1995, they had a fist fight in jail because Jerry said that four guys said that the Defendant and his half brother were spreading rumors about him. The Defendant testified that he does not know Fred Gradley, and he does not know where the Eat-A-Bite is but knows it is somewhere in the Sonya Quarters. The Defendant calls Fred Bush his half-brother because Bush and the Defendant's baby sister have the same father. He and Bush are friends. The Defendant testified that he was at Ms. Willie Mae Hayward's house on Jeannette Street (which is six or seven blocks from Kelly Street) on the nights of October 23 and 24, 1994. The Defendant explained that he and Ms. Hayward's daughters are good friends and they stayed up watching television from the night of October 23 until about 2:00 a.m. on October 24th. The Defendant testified that he slept on the couch in the living room and he woke up about 8:30 on the morning of the 24th. He left the house at approximately 12:00, went to his half brother's house and then to his house in Karst Park. The Defendant said he first heard of the murder on the news on the day it happened.
The Defendant testified that William Wansley was in the cell block with him for approximately five days. He explained that the cells are open during the day and closed at night and everybody has access into other people's sleeping cells. The Defendant said that he had two duplicate statements of Jerry Joseph's testimony in his sleeping quarters. According to the Defendant, Wansley shared the same sleeping quarters with him for one night. The Defendant testified that he went to church on Sunday and Jerry Joseph's statements were sitting on the shelf.
On cross-examination, the Defendant denied ever having been to Kelly Street, but he said he knows where it is. The Defendant denied belonging to a gang and explained the Cripp insignia on his left forearm as follows:
Q. It says Cripp?
A. Yeah.
Q. What's that?
A. Uh, that was just something that when I was in California that me and my friends who went to school together. You know what I'm saying? That's what we called ourselves.
Q. Is that a gang?
A. No, sir, it wasn't no gang. It was just likejust like, you know, how like you got country clubs that you belongs to or whatever. You know, we just all get together, we might do our homework together, we might go out to a basketball game the school might have or a football game, or whatever.
Q. Go down to the drugstore and have sodas together?
A. Yeah.
The Defendant testified that he also had his mother's name tattooed on his other forearm and "Thug" tattooed on the left side of his chest. He explained that this is "just a name that everybody together, you know, might use because you might be poor, you ain't rich, or you ain't in between. You're just come from, like, a poor family." The Defendant also stated that he has an "R," an "S" and a "C" tattooed on him which stands for "Rolling Sixties Cripps." Later in the Defendant's testimony, he testified that he has tattoos on *1112 his hands that "stands for, uh, neighborhood and it got a six and an oh right there." He affirmed that this stood for the Rolling Sixties.
The Defendant explained that he met Jerry Joseph in September of 1994 through his sister; Jerry Joseph's cousin and the Defendant's sister were dating. The Defendant acknowledged that he has known Freddie Bush (who he calls his half-brother) since July of 1994, when the Defendant moved to Alexandria. The Defendant denied knowing Joe General. According to the Defendant, the only statements he had read in connection with the case were made by Jerry Joseph. He testified that he and Fred Bush were in the cell together in early 1996 for approximately one week, but they never discussed the case because the Defendant was told by his lawyers not to discuss it with anybody.
The Defendant affirmed that he had scars on the back of his hand, but he explained that this occurred when he was punching at his girlfriend and he hit a window. He did not go to a hospital for treatment because the cuts were not deep enough for stitches.
Basically, this case boils down to a credibility determination. The testimony presented was sufficient to prove both the charged offense (first degree murder) and the offense for which the Defendant was convicted (second degree murder).
First degree murder is the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm upon a victim who is under the age of twelve or sixty-five years of age or older. La.R.S. 14:30.[2] Second degree murder is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm. La.R.S. 14:30.1.
In State v. Cortez, 96-859 (La.App. 3 Cir. 12/18/96); 687 So.2d 515, 519, this court stated:
... In State ex rel. Elaire v. Blackburn, 424 So.2d 246, 251-52 (La.1982), cert. denied, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983), the Louisiana Supreme Court held:
[I]f the defendant does not enter an objection [to an instruction on a responsive verdict on the basis that the evidence does not support that responsive verdict] (at a time when the trial judge can correct the error), then the reviewing court may affirm the conviction if the evidence would have supported a conviction of the greater offense, whether or not the evidence supports the conviction of the legislatively responsive offense returned by the jury.
It would be unfair to permit the defendant to have the advantage of the possibility that a lesser "compromise" verdict will be returned (as opposed to being convicted of the offense charged) and then to raise the complaint for the first time on appeal, that the evidence did not support the responsive verdict to which he failed to object. Therefore, at least when the defendant fails to interpose a timely objection to a legislatively responsive verdict, this court will not reverse the conviction if the jury returns such a verdict, whether or not that verdict is supported by the evidence, as long as the evidence is sufficient to support the offense charged.
"A principal to a crime must personally possess the requisite mental intent required for the commission of the offense." *1113 State v. Ortiz, 96-1609 (La.10/21/97); 701 So.2d 922, 933, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998). It was established at trial that Rita Rabalais was eighty-two at the time of the offense and that the Defendant, as part of a gang initiation, was personally involved in the beating and stabbing attack of Rita Rabalais which resulted in her death. Although there was no evidence that the Defendant actually hit or stabbed the victim, he held her while other defendants did so. Under these circumstances, there is no doubt the Defendant possessed the specific intent to kill or inflict great bodily harm upon the victim.

CHANGE OF VENUE
The Defendant filed a Motion for Change of Venue on June 25, 1998 alleging that the newspaper and television media had portrayed him as one of the persons present in the victim's residence at the time of the murder "by implying his `guilt by association' with other co-defendants who have been convicted of this offense." The Defendant noted in his motion that he is one of nine co-defendants, five of which had either been found guilty or had entered guilty pleas. A hearing on the motion was held on October 22, 1998. Various exhibits were introduced, including newspaper articles, the results of a telephone poll and video news footage. At the conclusion of the hearing, the court took the matter under advisement until the following day. On October 23, 1998, the parties argued their positions and the judge denied the motion to change venue. On March 9, 1999, another hearing on the venue issue was held. Counsel reurged the motion to change venue, asking the court to consider how the co-defendants' trials would affect the Defendant's right to a fair trial. Additional exhibits concerning news coverage of the case were introduced at the hearing. Although the exhibits were offered in evidence by co-defendant Elie's attorney, the Defendant's attorney indicated they were joining in the offering. Co-defendant Elie's attorney argued that the remaining defendants awaiting trial would be "lumped together" with the other five defendants who had all either been convicted or pled guilty. The court denied the motion, finding the evidence insufficient at that time to prove there was "such a prejudice or influence on prospective jurors to create a situation where a change of venue would be justified." The judge said he would entertain the motion again if it needed to be reurged at some later time. There is no indication in the court minutes of voir dire that the motion was reurged.
On appeal, the Defendant contends the trial court erred in denying his Motion for a Change of Venue. He claims the jury was selected despite widespread knowledge about the case. According to the Defendant, many of the prospective jurors had heard about the case and some said they had fixed opinions about the guilt of the Defendant. The Defendant does not mention any specific facts concerning jury selection, such as the number of challenges for cause used due to pretrial publicity, or anything of this nature.
The Defendant contends the murder of Rita Rabalais generated the most publicity of any case in Rapides Parish in the twentieth century. Local newspaper and television coverage was responsible, he claims, for continuous sensational and prejudicial coverage, and the coverage regarding the guilt of the other co-defendants had a "spillover" effect against the Defendant's presumption of innocence. He contends that no newspaper articles or news broadcasts questioned or "reasoned for innocence" of any defendant in the case. Thus, the Defendant claims he was denied his right to a fair trial.
At the first venue hearing, the defense introduced fifty-two newspaper articles ranging in date from October 25, 1994 to August 29, 1998. The early articles are mostly factual accounts of the discovery of the victim's body and speculation by the police department as to a motive. Later articles focused on arrests and indictments *1114 in the case and followed the individual cases as they moved through the legal system, including coverage of rulings on various pretrial motions, the progression of jury selection, testimony and evidence presented at co-defendants' trials, the entry of guilty pleas, and the outcome of trials and sentencing.
Of the fifty-two articles, the two most explicit ones concerning the Defendant's involvement in the case were printed on July 26, 1998. One article stated that convicted thief William Wansley, who once shared a cell with the Defendant, gave a recorded statement alleging that the Defendant told him about the victim's murder. The article contained excerpts from the statement, stating that the Defendant told Wansley the case involved the stabbing of an elderly woman and it concerned a gang initiation. According to the article, the Defendant told Wansley they picked her because she was white and it was part of a gang initiation in which several people took part. The article said the Defendant told Wansley he cut his hand with a knife while in the Rabalais house and that they threw the weapons into the Red River. It then stated that according to prior testimony in the case, a butcher knife and the broken steel shaft of a weedeater were used to inflict at least some of the wounds.
The same day, another article was printed which included reference to the Defendant's statements to a psychologist that in the early 1990's he became a member of the Rolling 60's Cripps; however, the psychologist noted that the Defendant said he was no longer involved in gangs and he was adamant about his innocence in the murder of Ms. Rabalais. The article explained that the Defendant reported he was a peripheral member of the gang while in California four to five years ago. It detailed the Defendant's explanation of the gang as being "more like a group of people who went to the same school and lived in the same neighborhood ... like an `old-fashioned gang' where membership was based upon respect." The article further noted that co-defendant Cedric Howard referred to his gang affiliation in his statement to police.
Also, at the first venue hearing, the defense introduced the results of a public-opinion survey regarding the case. The document included the questions asked and the conclusions after completion of the survey were as follows:

Conclusions
(1) Among those eligible to serve on the jury in this case, 44% already have detailed awareness of the case, and another 20% have general awareness. About one-in-three (literally, 36%) have no real awareness of the case.
(2) Twenty-eight percent (28%) of those eligible to serve have already decided the guilt or innocence of Mr. McCullough. Among these prospective jurors, Mr. McCullough is presumed guilty by 13-times as many as those who believe he is innocent.
Those who are already generally aware of the case are tremendously more likely to presume guilt over innocence. When these calculations are made among those who are generally aware of the case (i.e., 64% of those eligible to serve), only 2% presume the innocence of Mr. McCullough, and 41% relatively presume his guilt (16% "lean toward believing" guilt, and 25% "strongly feel" he is guilty).
Among those with detailed awareness of the case (i.e., correctly identified the race of the victim and the defendants), even more presume the defendant is guilty: 3% presume Mr. McCullough is innocent, and 47% relatively presume he is guilty.
Among those eligible to serve who have general, but not detailed, awareness of the case (i.e., the 15% who said "don't know" on the second survey question), the very large margins of presumed guilt over innocence are not seen: 3% presume innocence, and *1115 19% have a relative presumption of guilt.
Therefore, the survey finds that a strong majority (64%) of Rapides residents who are eligible to serve on this jury already have knowledge of the case, and a significant percentage (44%) have what we consider to be detailed knowledge. More importantly, higher awareness of the reported details of this case result in significantly higher levels of presumed guilt of the defendant.
At the March 9, 1999 venue hearing, the defense introduced ten new newspaper articles in addition to the ones previously introduced at the October, 1998 hearing. The new articles focused mainly on the request for a change of venue. At this hearing, the Defense also introduced an audit report showing the average paid circulation for the Alexandria Daily Town Talk for the twelve months ending December 31, 1997, was 38,155 for morning Monday through Saturday and 43,823 for Sunday.
The supreme court recently stated the standard utilized in determining whether a change of venue should be granted:
A defendant is guaranteed an impartial jury and fair trial. La. Const. art. I, § 16; State v. Brown, 496 So.2d 261, 263 (La.1986); State v. Bell, So.2d 307 (La.1975). To accomplish this, the law provides for a change of venue when a defendant establishes inability to obtain an impartial jury or fair trial in the original venue. Bell, 315 So.2d at 309; Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 1419-20, 10 L.Ed.2d 663 (1963). In unusual circumstances, prejudice against the defendant may be presumed. State v. David, 425 So.2d 1241, 1246 (La.1983). Absent unusual circumstances, the defendant bears the burden of showing actual prejudice. State v. Vaccaro, 411 So.2d 415, 423-24 (La. 1982); State v. Adams, 394 So.2d 1204, 1207-1208 (La.1981), State v. Williams, 385 So.2d 214, 215-17 (La.1980), cert. denied, 449 U.S. 1017, 101 S.Ct. 580, 66 L.Ed.2d 478 (1980); State v. Felde, 382 So.2d 1384 (La.1980). Whether the defendant has made the requisite showing of actual prejudice is "a question addressed to the trial court's sound discretion which will not be disturbed on appeal absent an affirmative showing of error and abuse of discretion." State v. Wilson, 467 So.2d 503, 512 (La.1985), cert. denied, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985).
Changes of venue are governed by La.Code Crim. Proc. art. 622, which provides:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
Several factors are pertinent in determining whether actual prejudice exists, rendering a change in venue necessary, including: (1) the nature of pretrial publicity and the degree to which it has circulated in the community; (2) the connection of government officials with the release of the publicity; (3) the length of time between the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury is to be drawn; (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant; and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire. Brown, 496 So.2d at 263; Bell, 315 So.2d at 311. Because a defendant is not entitled to a jury entirely ignorant of his case, he *1116 cannot meet his burden by merely showing a general level of public awareness of the case. Brown, 496 So.2d at 263.
State v. Hoffman, 98-3118 (La.4/11/00); 768 So.2d 542.
In State v. Goodson, 412 So.2d 1077, 1080-1081 (La.1982), appeal after remand, 437 So.2d 1174 (La.App. 2 Cir.1983), the supreme court discussed cases in which prejudice has been presumed and the standard for its application:
Prejudice was presumed in the circumstances under which the trials in Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); and Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), were held. As the high court in Murphy v. Florida, supra, [421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975)] explained:
"* * * In those cases the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings. In Rideau the defendant had `confessed' under police interrogation to the murder of which he stood convicted. A 20-minute film of his confession was broadcast three times by a television station in the community where the crime and the trial took place. In reversing, the Court did not examine the voir dire for evidence of actual prejudice because it considered the trial under review `but a hollow formality'the real trial had occurred when tens of thousands of people, in a community of 150,000, had seen and heard the defendant admit his guilt before the cameras.
"The trial in Estes had been conducted in a circus atmosphere, due in large part to the intrusions of the press, which was allowed to sit within the bar of the court and to overrun it with television equipment. Similarly, Sheppard arose from a trial infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival. The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob...."
The defendant in Goodson introduced thirty-five newspaper articles and one hundred and eight pages of transcripts of newscasts by local television stations in support of his motion to change venue. The publicity of the defendant's confessions, indictment in Bossier and Caddo Parishes and the pretrial proceedings identified him in the public mind as the Highland rapist. The court determined the defendant failed to show actual or presumed prejudice to such a degree that a fair trial would be impossible. Since voir dire examination had yet to be conducted, the court felt it was impossible to decide whether actual prejudice against the accused existed. However, because serious questions of possible prejudice had been raised, the judge's pretrial order refusing to change the venue was vacated and he was instructed to defer ruling on the issue until the completion of voir dire.
In State v. Brown, 496 So.2d 261 (La. 1986), a case relied upon by defense counsel at the second venue hearing, the supreme court held that the trial court erred in refusing to grant a change of venue. An expert in the field of public opinion polling testified his poll showed 87% of those polled had heard of the crime, 53% had heard of the defendant and an additional 27% were able to give his name. Fifty-nine percent of those who said they thought Brown was guilty believed he should receive the death penalty. The expert testified, "I think it's perceived by the people in my judgment, that the man is guilty, and I think the people want him committed to death." Id. at 262. After the Brown venue hearing, but before voir dire, the trial of Kenneth Prestridge, an *1117 unrelated case, was held. Prestridge was found guilty of first degree murder but received a life sentence. Outrage in the community was evident by the approximately two hundred letters sent to the local newspaper. Barely nine weeks after the letters appeared in the paper, voir dire in the Brown case commenced. Virtually every prospective juror was aware of the general facts of the case. The publicity was generally not inflammatory, but it was thorough and extensive. In the two months prior to trial, thirty-six articles were published in the paper, most on the front page. The defendant's escape from prison, recapture and extradition increased publicity of the case and each time the case appeared, the victim's death and the defendant's arrest, escape and re-arrest was reiterated. The paper often stated that the defendant had been out on bond for an armed robbery charge at the time of the crime. The supreme court concluded the extensive press coverage, the notoriety of the case and the outrage over Prestridge's verdict had a cumulative effect that deprived the defendant of a fair trial.
Although in the present case there were numerous newspaper articles and substantial news coverage of the murder of Rita Rabalais, the majority were factual accounts involving the discovery of the body, the investigation or the criminal proceedings against the individuals involved. The coverage spanned a four-year period and ended months in advance of the Defendant's trial. The accounts were not of the nature to incite passion or prejudice amongst the community and the Defendant did not show there was a strong public reaction to the murder, as was the situation in Brown. This is not a case in which prejudice should be presumed and the Defendant has failed to meet his burden of proving actual prejudice. Accordingly, this assignment is meritless.

PLEA BARGAIN TESTIMONY
The Defendant claims the trial court erred in failing to grant his Singleton[3] motion as to Jerry Joseph's testimony. The Defendant contended in his Singleton motion that offers or promises made by the State in exchange for testimony from a witness are illegal and forbidden under the Louisiana Public Bribery Statute, La.R.S. 14:118(A)(1)(d), and that evidence received as a result thereof should be suppressed from use at trial. A hearing on the Defendant's motion was held on August 28, 1998 before Judge Johnson and the matter was taken under advisement. On September 2, 1998, Judge Johnson recused himself from further consideration of the motion and he ordered that the motion be reargued and heard by another judge. On October 22, 1998, the Singleton motion was taken up before a different judge and, contrary to the Defendant's assertion, the motion was granted. The State filed a pretrial supervisory writ application which was granted by this court. State v. McCullough, et al., 98-1766 (La.App. 3 Cir. 12/29/98); 737 So.2d 49, writ denied, 99-0259 (La.2/26/99); 738 So.2d 590. This court relied on its previous holding in State v. Jenkins, 508 So.2d 191 (La.App. 3 Cir.), writ denied, 512 So.2d 438 (La.1987), and on United States v. Haese, 162 F.3d 359 (5th Cir.1998), and the fact that Singleton was vacated by the circuit originally rendering the decision and an en banc hearing was ordered. Since this court's pretrial ruling, the Singleton court has vacated its decision and the United States Supreme court denied certiorari. See U.S. v. Singleton, 165 F.3d 1297 (10th Cir.1999), cert. denied, 527 U.S. 1024, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999). Accordingly, this court's pretrial ruling should stand; Defendant's claim has no merit and is denied.

MOTION TO QUASH
The Defendant claims the trial court erred in not granting his Motion to Quash. In the motion, he alleged that the involvement of the judge in the appointment of the grand jury foreperson without *1118 random allotment is unconstitutional and in violation of the due process requirements of the United States Constitution. The Defendant mentions in his brief that he also attacked the manner of selection of the grand jury and petit jury venires. On June 3, 1999, the Defendant filed a motion to quash the indictment, challenging the composition of the grand and petit jury pools. Although the Defendant, in his brief, mentions the fact he challenged the composition of the jury pools, his argument to this court is limited to the issue of the selection of the grand jury foreperson by the court. Argument on this issue was presented to the trial court in a hearing held August 28, 1998. At the hearing, defense counsel argued that the grand jury foreman selection process was unconstitutional, but he did not present any evidence to support his claim. The trial judge denied the motion, noting that the judges were complying with the law regarding selection of the foreperson.
The grand jury returned a true bill on July 20, 1995. At that time, La.Code Crim.P. art. 413 provided that in parishes other than Orleans, the court selected one person from the grand jury venire to serve as foreman. The article was amended in 1999 to provide that the foreman is to be randomly selected from the impaneled grand jury.
In State v. Guillory, 97-179 (La.App. 3 Cir. 3/11/98); 715 So.2d 400, 414, writ denied, 98-955 (La.10/9/98); 726 So.2d 17, this court stated, "... the defendant must show that the percentage of minority persons in the general population who are qualified to serve as grand jurors is disproportionate to the actual number of minority grand jury forepersons over a significant period of time to establish a prima facie case. [Citations omitted]." The Defendant did not make the required showing at the hearing on the motion to quash. Thus, the trial court did not err in denying his motion.

ARTICLE 768 NOTICES
The Defendant claims the trial court erred in overruling his objection to the filing of Article 768 notices after the State's opening statement and in permitting the State to introduce his inculpatory statement in evidence. The Defendant contends this amounted to reversible error because he did not learn through discovery of the "complete substance" of his statement to be used at trial. The statement at issue in this assignment of error is the Defendant's communication to William Wansley. The Defendant contends he was aware of the allegations regarding his statement to Wansley, but contends the State failed to provide the substance of the statement in pre-trial discovery. The Defendant contends the "manner in which the statement was presented to the jury permitted no objective criteria for the jury to assess Wansley's credibility and being omitted from the state's opening statement, defendant was placed at a disadvantage in contradicting the alleged statement." The Defendant contends that the alleged statements made by the Defendant to Wansley should not have been admitted because the Defendant did not know "for sure" that the statements would be used as evidence until after opening statements.
The State contends that a copy of Mr. Wansley's statement was given to the defense and placed in the record before July 17, 1998. Additionally, the State notes the defense attempted to elicit additional "Kyle" [Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490, (1995)] material from the State as a result of obtaining the Wansley statement. The State concludes its argument by contending that the defense knew of this statement more than one year prior to trial and that the statement was the cause for it to maintain the original indictment against the Defendant.
On June 9, 1998, the prosecutors sent defense counsel a letter enclosing a copy of the transcript of William Wansley's statement. The letter indicated that counsel *1119 was given a copy of the statement soon after it was taken. The prosecutors indicated that in light of the statement, they had decided not to amend the bill of indictment to a lesser charge.
On August 21, 1998, defense counsel filed a Supplemental Motion for Disclosure of Evidence Favorable to the Accused, requesting all exculpatory evidence and other information concerning William Wansley. On August 25, 1998, the State filed a written response indicating that all of the requested information of which it was aware had been previously provided and that the witness was available to the Defendant's attorneys. On October 21, 1998, the State filed a supplemental answer providing more information regarding the circumstances under which they learned of the information Mr. Wansley had and the taping of his statement. The State also listed the information concerning Mr. Wansley that it previously provided to the defense.
La.Code Crim.P. art. 768 states:
Unless the defendant has been granted pretrial discovery, if the state intends to introduce a confession or inculpatory statement in evidence, it shall so advise the defendant in writing prior to beginning the state's opening statement. If it fails to do so a confession or inculpatory statement shall not be admissible in evidence.
The Defendant was given pretrial discovery and knew of the substance of the Defendant's statements to Wansley more than one year prior to trial. The trial court did not err in overruling the Defendant's objection to the allegedly untimely Article 768 notice. Additionally, the defense had over one year to examine Wansley's statement in preparation for trial. The Defendant has failed to show he suffered prejudice.

VICTIM'S VIDEOTAPE
During James Wayne Yarbrough's testimony, the State introduced a videotape which showed the victim at a family reunion. The prosecutor introduced the tape to establish the victim's age. The defense objected, stating it was willing to enter a stipulation as to the victim's age. The judge allowed the tape to be shown to the jury, but from the comments in the record, it appears that the only portion of the video shown to the jury was the victim stating her year of birth. Although we cannot determine exactly which portion of the tape was shown to the jury, the victim did not appear on the screen in the segment where she stated her age. Additionally, after the tape was shown, Mr. Yarbrough was asked where the lady who made the statement was seated. He said it was "just to theto the left ofout of the view of the recorder at that time." Prior to introduction of the tape, the victim's age had been established through the testimony of the victim's sister-in-law, Leta Juneau. Later in the trial, Danita Coco, the bookkeeper at Sacred Heart Church Rectory, testified as to the victim's age from her baptismal records.
Defendant contends the showing of the videotape prejudiced him and that the victim's age was not a "materially contested issue." On the other hand, the State contends it had to prove the victim's age as an element of the crime and that her stating her age was the best evidence. Additionally, the State contends the view of the victim was "the best corroboration for her assertion of age."
This issue was addressed in co-defendant Fredrick Gradley's appeal to the supreme court.[4] The court noted that the portion of the tape showing the victim stating her age might be considered cumulative. However, the court noted that only a brief portion of the tape was shown. The victim had stated her age and the tape *1120 continued long enough for James Yarborough to leave the stand and identify the victim on the film. The film was then stopped upon defense counsel's objection. The supreme court felt that even if the admission of a portion of the videotape was cumulative, the defendant was not prejudiced thereby. See State v. Gradley, 97-0641 (La.5/19/98); 745 So.2d 1160. The same issue was also raised in State v. Howard, 98-0064 (La.4/23/99); 751 So.2d 783, cert. denied, 528 U.S. 974, 120 S.Ct. 420, 145 L.Ed.2d 328 (1999).[5] The court stated that the same reasoning employed in Gradley applied and found the claim had no merit.
In this case, Mr. Yarborough's testimony indicates that although the jury heard the victim's voice, they did not see her face on the video. It appears that in Gradley, Mr. Yarborough was allowed to actually point out his aunt to the jury as the videotape was being played. Thus, there was even less chance for potential prejudice in this case. The supreme court's conclusions in Gradley and Howard apply. This assignment of error is meritless.

PHOTOGRAPHIC EVIDENCE
At trial, five photographs labeled S20A through S20E were introduced in evidence. The photographs depicted the victim's body as it was found in her bedroom closet. At trial, Officer John Griffith identified the five photographs and explained what each depicted. Defense counsel objected to the introduction of the photographs, contending 20A through 20C were duplicitous as were 20D and 20E. Defense counsel stated that the photographs were bloody and gory and he felt the State should not be allowed to introduce duplicitous photographs of this nature. The judge held that while the pictures were somewhat duplicitous, the State had a right to introduce them.
On appeal, the Defendant does not argue that the photographs were repetitive. Rather, he contends the trial court erred in admitting State Exhibit Nos. 20A through 20E because although they were relevant to the cases of other co-defendants who were active participants in the crime, they were not relevant to his case as he was not a participant. The Defendant contends they had no probative value and did not establish his presence at the scene of the crime. The State points out that the photographs establish where and how the crime was committed and serve to corroborate other testimony.
In State v. Green, 98-1388 (La.App. 3 Cir. 3/31/99); 735 So.2d 723, co-defendant Joseph Green contended the trial court erred in permitting the state to introduce numerous gruesome photographs that were unduly prejudicial. This court stated:
The admission of gruesome photographs will not be overturned unless it is clear the prejudicial effect of the photographs outweighs their probative value. State v. Lindsey, 543 So.2d 886, 894-95 (La. 1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990); State v. Eaton, 524 So.2d 1194, 1201 (La.1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989). "This court will not find that photographs were admitted in error unless they are so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence." Copeland, 530 So.2d at 543; Eaton, 524 So.2d at 1201. The fact the photographs are gruesome does not, in and of itself, prevent their admissibility. Comeaux, 514 So.2d at 97....
Id. at 732.
This court found that the photographs were relevant and probative in proving the State's case and that the photographs at *1121 the scene corroborated the testimony that the victim's bloody and bruised body was found in her bedroom closet.
This case is no different. The five photographs were relevant and probative for the same reasons espoused in Green. Although the Defendant contends they were not relevant to his case because he was not an active participant in the crime, the testimony at trial established that he was involved in the commission of the offense. The trial judge did not err in admitting these five photographs in evidence at trial. Accordingly, this assignment of error has no merit.

MOTIONS IN LIMINE
The defense filed five motions in limine seeking the admission of the statements of Joseph Green, Lonnie Simmons, Jr., Cedric Howard, Fredrick Gradley and Fredrick Bush. The defense contended these statements exculpated the Defendant and were critical to his defense. Additionally, the defense contended these individuals would assert their Fifth Amendment privileges as to all questions and/or would refuse to testify, making them unavailable for purposes of La.Code Evid. art. 804(A). The court deferred addressing the motions until trial. At trial, when the motions in limine were taken up, defense counsel informed the judge that he felt the co-defendants were going to refuse to testify. Thus, he contended the statements were admissible under La.Code Evid. art. 804(b). Defense counsel argued the statements were reliable because they were taken by police officers and were taken "prior to the defendant's arrest." Prior to denying the motions in limine, the judge commented that he thought it would be unfair for the statements to be admitted without the witnesses being subject to cross-examination. Fred Bush was called first and he affirmed that he wanted to invoke his Fifth Amendment right not to answer questions.[6] Fredrick Gradley testified that he was on death row and that he wanted to exercise his Fifth Amendment privilege as well. Cedric Howard, who at the time of trial was residing at Angola State Prison, also invoked his privilege against self-incrimination. Defense counsel proffered the motions in limine, the attached statements and the court's ruling on the issue.
The Defendant contends the trial court erred in not granting his motions in limine and in refusing to allow the use of the statements in lieu of live testimony when the defendants invoked their right against self-incrimination. The Defendant states that his presence at the scene was established by two convicted felons and he was prohibited from using other co-defendants' statements that did not mention his presence at the scene of the crime. The Defendant claims Bush's statement contradicted Jerry Joseph's statement, but because Bush was awaiting trial, his testimony was not available and the defense therefore had no other means to present a defense other than introduction of Bush's statement. The Defendant claims he is prejudiced "because the prosecution has an unfair advantage and defendant cannot call Fred Bush to contradict the testimony of Jerry Joseph." He argues that the prosecution cannot make a co-defendant incompetent as a witness for the Defendant. The Defendant contends the trial court should have admitted the statements of Fred Bush, Joseph Green, Lonnie Simmons, Cedric Howard and Fredrick Gradley into evidence because in their statements, there was no mention of the Defendant's presence at the crime scene.[7]
*1122 Counsel's statements at trial indicated Bush was awaiting sentencing, implying he had already been convicted. Additionally, although the written motions sought introduction of the statements of five defendants, at trial, defense counsel referred to only three of the defendants: Fredrick Gradley, Cedric Howard and Fredrick Bush. Thus, our discussion will be limited to whether the statements of those three individuals should have been admitted.
This issue was addressed by this court in State v. Green, 98-1388 (La.App. 3 Cir. 3/31/99); 735 So.2d 723.[8] In that case, Green contended the trial court erred in refusing to allow the introduction of the typed statement of Fred Bush. The defendant contended he was prejudiced because Jerry Joseph testified at trial for the state, but Bush invoked the Fifth Amendment when subpoenaed to testify. For this reason, Green argued he should have been allowed to introduce Bush's statement. This court set forth the following discussion of the applicable caselaw:
In State v. Van Winkle, 658 So.2d 198 (La.1995), the Louisiana Supreme Court stated:
A criminal defendant has the constitutional right to present a defense. U.S. Const. Amend. 6; La. Const. Art. 1 § 16; Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); State v. Gremillion, 542 So.2d 1074 (La.1989); State v. Vigee, 518 So.2d 501 (La.1988). Due process affords the defendant the right of full confrontation and cross examination of the State's witnesses. Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); State v. Mosby, 595 So.2d 1135 (La.1992). It is difficult to imagine rights more inextricably *1123 linked to our concept of a fair trial.
Evidentiary rules may not supersede the fundamental right to present a defense. In State v. Gremillion, supra, the defendant attempted to introduce evidence that third parties, rather than the defendant, had killed the victim. The evidence consisted of a statement that the victim had made to a sheriff's deputy who investigated the crime. The statement was that he had been attacked and beaten by three white males. The trial court and the Court of Appeal both held the statement was inadmissible hearsay. We agreed that the statement was hearsay and that it did not meet any applicable exception (res gestae, dying declaration, business records). However, we concluded that normally inadmissible hearsay may be admitted if it is reliable, trustworthy and relevant, and if to exclude it would compromise the defendant's right to present a defense. See Chambers v. Mississippi, 410 U.S. at 302, 93 S.Ct. at 1049. Exclusion of the statement in Gremillion impermissibly impaired the defendant's fundamental right. 542 So.2d at 1079, citing State v. Washington, 386 So.2d 1368 (La. 1980).

Van Winkle, 658 So.2d at 201.
Likewise, in State v. Vigee, 518 So.2d 501 (La.1988) the Louisiana Supreme Court held that hearsay evidence supporting the defendant's theory of the case and undermining the State's lead witnesses was relevant and excluding it mandated reversal.
Id. at 733-734.
This court then found Green's claim had no merit, reasoning as follows:
In the present case, the Defendant argued in brief that the statement of Bush contradicted the statement of Joseph. We have read the trial testimony of Jerry Joseph and the typed statement given by Bush. While the Defendant is correct in stating that there are discrepancies between the two statements, they are not such that a reasonable jury would likely have found that the Defendant was not involved in the crime. We further note that the typed statement given by Bush was given before he was arrested and charged as a co-defendant for the first degree murder of the victim. At the time of the Defendant's trial, Bush had been formally charged with the first degree murder of the victim and was an inmate at the Rapides Parish Detention Center.
Upon review of the record and Bush's statement, the typed statement was neither shown to be reliable and trustworthy, nor was it relevant to protect the Defendant's right to a defense. Therefore, this assignment of error is without merit.
Id. at 734.
The statements were not shown to be reliable and trustworthy, even though the second of Fredrick Bush's two statements was made under oath. The supreme court has considered a similar issue which lends some guidance on determining reliability. In State v. Adams, 550 So.2d 595 (La. 1989), appeal after remand, 609 So.2d 894 (La.App. 4 Cir.1992), the defendant admitted to murdering a New Orleans police officer's wife for a sum of money offered by Anthony Calcagno. The court of appeal determined the trial court erred in disallowing Calcagno's statements to a third person without determining their reliability. The appellate court remanded the case for the trial court to make this determination. The state sought review, contending that Calcagno's statements were properly excluded due to their unreliability after he exercised his Fifth Amendment right not to testify. Calcagno had made inculpatory statements outside in the hall during trial. Because Calcagno had suffered serious head injuries, the trial judge ordered a psychiatric examination after which Calcagno was found competent to testify. After being sworn as a witness, *1124 Calcagno invoked his Fifth Amendment privilege, and the trial court refused to allow the testimony of a reporter who had heard Calcagno's statements. The supreme court set forth the following discussion of the issue:
Hearsay is testimony in court or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein and thus resting for its value upon the credibility of the out-of-court asserter. State v. Martin, 458 So.2d 454 (La.1984). The central concern in the exclusion of hearsay evidence is lack of reliability because the declarant is not present, the statement is not made under oath and it is not subject to cross-examination. C. McCormick, Evidence § 245 (E. Cleary ed.1984). La. R.S. 15:434 provides: "Hearsay evidence is inadmissible, except as otherwise provided in this Code." This court has recognized that the traditional exceptions to the hearsay rule remain in force despite their exclusion from the Code of Criminal Procedure. State v. Smith, 285 So.2d 240 (La.1973). A declaration against penal interest is a recognized exception to the hearsay rule that is admissible when declarant is unavailable at trial and when there is additional evidence indicating that the declarant's statement is reliable. State v. Rushing, 464 So.2d 268 (La.1985).
In Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), the United States Supreme Court has also recognized that a defendant's fundamental constitutional right to present witnesses in his own defense requires the court to allow such hearsay evidence if the surrounding circumstances provide "considerable assurance of [the statements'] reliability." The Court considered evidence of the circumstances surrounding a third party's inculpatory statements. The declarant, Gamble McDonald, confessed to the murder of a police officer "on four separate occasions, once when he gave a sworn statement to Chambers' counsel and three other times prior to that occasion in private conversations with friends." McDonald later recanted those confessions. The trial court excluded the testimony of the three witnesses to whom McDonald had confessed shortly after the crime. Each statement was a confession to the murder and was made "spontaneously to a close acquaintance shortly after the murder had occurred." Each was also corroborated by independent evidence that McDonald owned a .22 caliber revolver, the type of gun used in the murder, was present at the scene of the crime, and was seen with a gun in his hand at the time of the murder. The Court concluded that the hearsay statements "bore persuasive assurances of trustworthiness" and were admissible under the declaration against interest exception.
Id. at 597-598.
The court concluded:
Although the hearing and evaluations concerned the issue of Calcagno's competency to testify, the evidence also provided an indication of the statements' reliability. The trial judge knew the substance of Calcagno's inculpatory statements and the surrounding circumstances. The inculpatory statements were clearly against Calcagno's penal interest, as he confessed to committing the murder. Because Calcagno had asserted his fifth amendment privilege against self-incrimination, he was legally unavailable to testify. The inculpatory statements were made approximately four years after the murder. He also made the statements publicly in the hall outside of the courtroom in which Adams' trial was being conducted. There was no independent corroborating evidence linking Calcagno to the murder. After considering the evidence, the trial judge excluded the statements due to their unreliability. The trial judge *1125 was correct in this ruling. The court of appeal erred in holding otherwise.
Id. at 598.
The trial court did not err in refusing to admit the statements in evidence as the defense failed to establish their reliability. Other than noting that the statements were made to police officers prior to the Defendant's arrests, counsel did not present anything to establish their reliability. Although not mentioned at the hearing on the motions in limine, the fact that Bush's second statement was made under oath implies a somewhat higher level of reliability; however, the statement did not contain any statements against penal interest and, as the testimony at trial and the contents of the statement established, Bush and the Defendant consider themselves stepbrothers.

JURY CHARGES
The Defendant contends the trial court erred in refusing to include eight requested charges in its charge to the jury. Defense counsel's comments at the jury charge conference indicate that the first two requested instructions were duplicitous and he was requesting the court choose one of the two. The first two requested charges are as follows:
An accomplice is defined as one who is associated with another in the commission of a crime. The testimony of an accomplice witness may be competent evidence but it should be corroborated with real and independent evidence tending to implicate the defendant and not as to mere details of how the crime was committed. The corroboration should be of some material fact which is more than suspicion that defendant was involved. Accomplice witness testimony should be carefully examined and acted upon with great caution before being relied upon as competent evidence.
An accomplice is defined as one who is associated with another in the commission of a crime and an accomplice is a competent witness, either for the state or for the defendant. Whether the accomplice has been convicted or not, whether he has pleaded guilty or nol pros or dismissal has been entered into, or whether he be joined in the same Bill of Information or Indictment with the person on trial or not, corroboration is desirable, but it is not always indispensable. The jury may convict on his uncorroborated testimony. And while it is not the rule of law, it is rather the rule of our experience in dealing with that class of testimony that while you may convict upon the uncorroborated testimony of an accomplice, still you should set upon his testimony with great caution, subject to great careful examination of the weight of the other evidence in the case. And you are not to convict upon such testimony alone unless satisfied, after a careful examination of its truth, that you feel you can safely rely on it. What the law means by corroboration of the testimony of an accomplice is not merely the corroboration of the accomplice's narrative, and the mere details of how the crime was committed or the crime charged was committed, but some real and independent corroboration intending to implicate the defendant in the commission of the offense charged. It is not sufficient to corroborate an accomplice as to the facts of the case. Generally, he should be corroborated as to some material fact which tends to prove that the accused was connected with the crime charged.
Prior to closing arguments, defense counsel cited State v. Schaffner, 398 So.2d 1032 (La.1981), State v. Murray, 375 So.2d 80 (La.1979) and State v. May, 339 So.2d 764 (La.1976) as support for using the foregoing charges. The State pointed out that the supreme court in Cedric Howard's case had held that the charge should not be used. The trial court denied the request to include the requested charges. On appeal, the Defendant contends that the jury should have been given these instructions to aid them in dealing with the *1126 testimony of Jerry Joseph and William Wansley. The Defendant claims "no material point was confirmed in the accomplice testimony (of Jerry Joseph), except that version which tended to aid Jerry Joseph."
In State v. Howard, 98-0064 (La.4/23/99); 751 So.2d 783, the defense relied on these same three cases as support for its contention that the trial judge should instruct the jury to treat uncorroborated accomplice testimony with great caution. The supreme court noted that when the accomplice's testimony is corroborated by other evidence, such language is not required. Finding Jerry Joseph's testimony was corroborated by the testimony of other witnesses and by physical evidence found at the murder scene, the court concluded the trial court properly omitted the instruction on uncorroborated accomplice testimony.
We reach the same result in this case. Jerry Joseph's testimony was corroborated by the testimony of the officers regarding the evidence found at the scene. Rubber gloves like the ones used by some of the perpetrators and knives were found at the scene. The photographs portraying the victim's injuries and the coroner's testimony regarding the types of injuries suffered by the victim were consistent with Joseph's testimony about the way the wounds were inflicted. Additionally, Joseph's testimony regarding the cleanup efforts following the murder is consistent with the finding of very few fingerprints, footprints or other evidence of this nature. Contrary to the Defendant's contention, this instruction was not needed for the jury to "deal with" William Wansley's testimony as he was not an accomplice to the murder. The trial court did not err in refusing to include either of these instructions in his charge to the jury.
The Defendant very briefly argues that the trial court should have given his third requested jury charge because Jerry Joseph made a plea bargain for his testimony. In this proposed charge, the jury was to be instructed that if any person was induced to testify by a promise of immunity or because of a hope that he would be rewarded or would benefit from implicating the defendant, the jury must take this fact into consideration in determining what weight to give the testimony. As authority for this charge, the defense cited State v. Brady, 381 So.2d 819 (La. 1980) and State v. Smith, 604 So.2d 995 (La.1992). The prosecutor argued at the jury charge hearing that these cases did not stand for the proposition for which they were offered. These cases are not applicable as they discussed limitations on the cross-examination of witnesses with regard to pending charges and expectations of leniency. They did not discuss this issue in the context of jury instructions.
In instructing the jury, the judge stated:
As the only judges of the credibility of the witnesses and of the weight their testimony deserves, you should scrutinize carefully, the testimony and the circumstances under which the witnesses testified. In evaluating the testimony of a witness, you may consider ... their manner while testifying, or any reason they may have for testifying for or against the State or Defendant, and the extent to which the testimony is supported or contradicted by other evidence.
The judge's rejection of this proposed jury instruction was proper because it was adequately covered in the general charge. See La.Code Crim.P. art. 807 and State v. Peterson, 96-1663 (La.App. 3 Cir. 6/4/97); 696 So.2d 211, writ denied, 97-1742 (La.11/26/97); 703 So.2d 644.
The fourth special requested jury instruction stated that the jurors must not resort to extraneous facts or circumstances in reaching a verdict; however, they may consider the lack of evidence as to any essential elements of the offense and the lack of evidence may be relied upon as the basis to establish reasonable doubt. It stated the jury is not restricted to the evidence adduced from *1127 the witness stand for the creation of reasonable doubt. The judge instructed the jury that the burden is on the State to prove the Defendant's guilt beyond a reasonable doubt and that in considering the evidence, they must give the Defendant the benefit of every reasonable doubt arising out of the evidence or a lack of evidence. Later in the charges, the judge stated, "You must determine whether or not a fact has been proven only from the evidence presented or from the lack of evidence." The trial judge did not err in failing to include this requested instruction as it was covered in the general instruction. See La.Code Crim.P. art. 807.
Requested Charges Nos. 7 and 8 essentially instructed that one's presence at or near a crime scene at or near the time of the offense without more does not render them guilty of the offense. The trial judge's charge to the jury adequately explained that mere presence at the scene of the crime does not render one guilty. The judge defined specific intent as that state of mind which exists when the circumstances indicate the defendant actively desired the prescribed criminal consequences to follow his act or failure to act. He later discussed principals as follows:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the defense [sic], aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime are principals. Not all principals are automatically guilty of the same grade of the offense. In order to be a principal to first degree murder, an accused who did not physically who did not physically commit the crime must be shown to have personally possessed the specific intent to kill or inflict great bodily harm.
The judge subsequently defined second degree murder and manslaughter, giving the elements for each. The charge gave the jury a thorough explanation of the concept of principals as well as the relevant intent requirements which clearly indicated that mere presence at a crime scene does not render one guilty. The judge did not err in refusing to give either of these two instructions.

MOTIONS FOR NEW TRIAL
In his original Motion for New Trial, the Defendant claimed the verdict was contrary to the law and evidence because the State failed to prove the essential elements of second degree murder or that the Defendant acted as a principal to second degree murder. He contended that the evidence failed to prove he acted with specific intent to kill or inflict great bodily harm or that he was actually present at the crime scene. These arguments focus on La.Code Crim.P. art. 851(1), which states:
(1) The verdict is contrary to the law and the evidence;
An argument under this portion of the article presents nothing for review on appeal. See State v. Hampton, 98-0331 (La.4/23/99); 750 So.2d 867, cert. denied, 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999); State v. Snyder, 98-1078 (La.4/14/99); 750 So.2d 832, fn. 21-22, and La.Code Crim.P. art. 858. The Defendant's arguments regarding the sufficiency of the evidence have been previously addressed in this opinion.
When ruling on a motion for new trial, the trial court must apply the `thirteenth juror' standard and review the weight of the evidence. On review, the appellate court determines if the trial judge abused his discretion. State v. King, 96-1303 (La.App. 3 Cir. 4/2/97); 692 So.2d 1296. Even if this court were to review the trial court's ruling, we are unable to say that the court abused its discretion.
The next ground of the motion for new trial which the Defendant mentions is that the trial court erred in refusing to grant a continuance for the defense to secure the presence of Willie Mae Hayward, who would have testified that the *1128 Defendant was at her house on the night of the murder and that he did not leave her residence until after the homicide had been completed. La.Code Crim.P. art. 851(2) states that the trial court shall grant a new trial when its ruling on a written motion or an objection made during the proceedings shows prejudicial error.
On October 12, 1999, during jury selection, the defense filed a motion for continuance due to the unavailability of witness Willie Mae Hayward. In the motion, the defense stated that on August 19, 1999, they requested the clerk of court subpoena the witness at three separate locations. They claim domiciliary service was made on August 26, 1999, and that another request for service was made on September 21, 1999; however, they were not successful in securing Ms. Hayward's appearance. As an alternative to a continuance, the defense requested the State stipulate that according to Ms. Hayward's statement, she was at home on the evening of October 23, 1994 and the morning of October 24, 1994 sleeping on a mat on the floor and that the Defendant was sleeping on the couch above her. When she awoke at 7:00 a.m. to go to work, he was still asleep on her couch. The defense stated that if Ms. Hayward were called she would testify that when she left the house at 8:30 a.m. to go to work, the Defendant was still asleep. In its prayer for relief, the defense additionally requested that an instanter subpoena be issued for this witness. To his motion, defense counsel attached an affidavit detailing his efforts to contact Ms. Hayward.
Court minutes show the court denied the motion for continuance and ordered an instanter subpoena for Ms. Hayward. La. Code Crim.P. art. 709 states:
A motion for a continuance based upon the absence of a witness must state:
(1) Facts to which the absent witness is expected to testify, showing the materiality of the testimony and the necessity for the presence of the witness at the trial;
(2) Facts and circumstances showing a probability that the witness will be available at the time to which the trial is deferred; and
(3) Facts showing due diligence used in an effort to procure attendance of the witness.
In State v. Washington, 407 So.2d 1138 (La.1981), the supreme court held that the trial court did not abuse its discretion in denying a motion for continuance where the defense failed to show it was probable that the unavailable witness would be available to testify at a later date. In the present case, the motion does not indicate or allege that Ms. Hayward would be available to testify at some later date.
The next part of the motion for new trial concerns the trial court's refusal to instruct the jury on accomplice testimony and the trial court's refusal to allow the admission of the co-defendants' statements after they invoked their right not to testify. In our earlier analysis, we concluded the trial court did not err in these rulings. Thus, the Defendant's argument fails as to these points. Accordingly, this assignment of error is meritless.

EXCESSIVE SENTENCE
The defense contends the trial court erred in imposing an excessive sentence on this young Defendant whose involvement, if any, was limited to that of a principal whose participation was "slight." No motion to reconsider sentence was filed in this case. La.Code.Crim.P. art. 881.1(D) provides that the failure to timely file a motion to reconsider sentence precludes the Defendant from raising an objection to his sentence on appeal. Furthermore, second degree murder carries a mandatory life sentence of imprisonment at hard labor without the benefit of parole, probation or suspension of sentence. This assignment of error is denied.

*1129 CONCLUSION

The Defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Joseph Michael Elie III, Frederick Demond Bush and Lonnie Ray Simmons, Jr. were jointly charged with the Defendant. The remaining defendants were: Fredrick Gradley, Cedric Howard, Jerry Joseph, Joseph General and Joseph Green.
[2] There was evidence that some of the defendants planned to burglarize the victim's home and that Mr. Joseph asked for a cut of the money and got $50.00 from Joe General. William Wansley testified that the Defendant told him that everyone took turns stabbing and beating an old lady believed to have money. Whether the Defendant was a principal to the aggravated burglary need not be decided as it is clear the Defendant shared the specific intent to kill the victim who was over the age of sixty-five.
[3] United States v. Singleton, 144 F.3d 1343 (10th Cir.1998).
[4] Gradley received the death penalty. Thus, he appealed directly to the Louisiana Supreme Court.
[5] Howard involved the appeal of co-defendant Cedric Howard and concerned the playing of the same tape at issue in the present case.
[6] Defense counsel informed the court that Bush had not been sentenced but was still incarcerated.
[7] We note that at the time of the Defendant's trial, Cedric Howard and Fredrick Gradley had been convicted of first degree murder and sentenced to death. Their convictions and sentences had been affirmed by the Louisiana Supreme Court. See State v. Howard, 98-0064 (La.4/23/99); 751 So.2d 783 and State v. Gradley, 97-0641 (La.5/19/98); 745 So.2d 1160. From the comments made by defense counsel at the hearing on the motions in limine, we assume Fredrick Bush had been convicted and was awaiting sentencing. It appears that Howard and Gradley had no valid Fifth Amendment privilege to assert at trial. See State v. Smith, 96-261 (La.App. 3 Cir. 12/30/96); 687 So.2d 529. Whether Bush had a Fifth Amendment privilege is not as clear. In Smith, this court stated that a witness who had been convicted and sentenced to death had no valid Fifth Amendment privilege to assert at a co-defendant's subsequent trial "as his guilt had already been adjudged." Id. at 542. However, later in the opinion, this court stated, "... even if one concludes that Lavalais continued to have a valid Fifth Amendment claim after his conviction, based on the fact that his appeal was pending, the grant of immunity would have made the claim of the privilege moot." Id. at 542. The fourth circuit, discussing this issue, has stated:

Both the United States Constitution and the Louisiana Constitution provide a privilege against self-incrimination. U.S. Const., Amend. V; LSA-Const. Art. 1 § 16. A witness may therefore assert the privilege when he has reasonable cause to apprehend danger from a direct answer. Hoffman v. United States, 341 U.S. 479, 487, 71 S.Ct. 814, 818, 95 L.Ed. 1118, 1124 (1951).
Normally, a witness, as opposed to the defendant on trial, may assert the privilege only with respect to particular questions. State v. Wilson, 394 So.2d 254 (La.1981); In re Parker, 357 So.2d 508 (La.1978). However, a blanket privilege is permitted, despite the compelling interest of the accused to present a defense, when it is evident that the answer to questions or an answer in explanation of the refusal to answer any questions posed could result in injurious disclosure. State v. Coleman, 406 So.2d 563 (La.1981).
As noted by the State, this exception is generally applied when the witness is awaiting trial or sentencing for charges arising out of the same incident as the defendant's, and the defendant seeks to question the witness about the incident. The exception was extended by this court to include a co-defendant whose case was nolle prossequied prior to the defendant's trial. State v. Adams, 537 So.2d 1262 (La.App. 4th Cir. 1989), reversed on other grounds, 550 So.2d 595 (La.1989).
State v. Larpenteur, 93-1424 (La.App. 4 Cir. 4/28/94); 636 So.2d 1103.
Defense counsel did not attempt to compel the testimony of any of the three co-defendants. While it is questionable whether the co-defendants were in fact unavailable for purposes of La.Code Evid. art. 804, it is not necessary to resolve this issue because we find the statements were not shown to be reliable and trustworthy.
[8] Joseph Green, a co-defendant.